[No. A076156. First Dist., Div. Two. May 26, 1998.]

FRANK GUTIERREZ, Plaintiff and Respondent, v.
CASSIAR MINING CORPORATION, Defendant and Appellant.

## COUNSEL

Stark, Well, Rahl, Schwartz & Schieffer, May Lee Tong, Shea & Gardner, Thomas J. Mikula, David J. Katz and Reena N. Glazer for Defendant and Appellant.

James L. Oberman and Brayton Harley Curtis for Plaintiff and Respondent.

## OPINION

**LAMBDEN, J.**—A jury in the damage phase of a trial pertaining to asbestos-related injuries awarded plaintiff Frank Gutierrez (Gutierrez) damages of $97,240, including $37,240 as economic damages, for occupational exposure to asbestos at a cement manufacturing plant for which defendant Cassiar Mining Corporation (Cassiar) was the supplier of asbestos fiber. Cassiar appeals the judgment, raising three challenges to the economic damages under *Potter* v. *Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795] (*Potter*), and one against the entire judgment for the exclusion of a defense witness. We will reverse in part.

A brief overview is enough to frame the key issues. Gutierrez, age 46 at the time of trial, worked from 1970 to 1975 for the manufacturer Certain-Teed, at a plant in Santa Clara, where the exposure took place. The jury's

special verdict assigned percentages of comparative fault at 20 for Cassiar, 55 for CertainTeed, 2 for Gutierrez and 23 for "all others." Gutierrez had not yet suffered serious disability or medical costs but had early signs of asbestos-related lung injury and sought, as economic damages, the costs of future medical monitoring. Cassiar did not dispute being the plant's supplier of asbestos and, for the most part, conceded Gutierrez's medical condition. It defended against negligence and product liability allegations by stressing comparative fault, warnings Cassiar placed on its product, general knowledge by asbestos workers (by the early 1970's) of asbestos exposure risks, and preexisting lung conditions caused by Gutierrez having smoked and had exposure to tuberculosis (TB). This appeal concerns, for the most part, issues about the preexisting conditions.

### Appeal

### I. *Medical monitoring damages*

■ Cassiar's first two contentions share a single legal underpinning—the need under *Potter* for a toxics-exposed plaintiff to show that economic damages for costs of medical monitoring are attributable to the alleged exposure and not preexisting conditions.

■ *Potter* held: "[T]he cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiff's toxic exposure and that the recommended monitoring is reasonable. In determining the reasonableness and necessity of monitoring, the following factors are relevant: (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis. Under this holding, it is for the trier of fact to decide, on the basis of competent medical testimony, whether and to what extent the particular plaintiff's exposure to toxic chemicals in a given situation justifies future periodic medical monitoring." (*Potter, supra,* 6 Cal.4th 965, 1009, approving *Miranda* v. *Shell Oil Co.* (1993) 17 Cal.App.4th 1651, 1655-1657 [26 Cal.Rptr.2d 655].)

■ The trial court below gave BAJI No. 14.10.1, which tracked the *Potter* language just quoted, modified to refer to "asbestos" rather than

"chemicals." Cassiar, however, concentrates on what the instruction did not go on to say.

■ *Potter* had added, as to preexisting conditions: "[T]oxic exposure plaintiffs may recover 'only if the evidence establishes the necessity, as a direct consequence of the exposure in issue, for specific monitoring beyond that which an individual should pursue as a matter of general good sense and foresight.' [Citation.] Thus there can be no recovery for preventative medical care and checkups to which members of the public at large should prudently submit. [Citation.]" (*Potter, supra,* 6 Cal.4th at p. 1009, fn. omitted.) The court then cited the example of a plaintiff with voluntary exposure to carcinogens through smoking, and concluded: "While there is no question that a defendant ought not to be liable for medical monitoring of a plaintiff's preexisting condition that is unaffected by a subsequent toxic exposure negligently caused by the defendant, we see no reason why the defendant should not be held responsible for any increased or different monitoring of the preexisting condition (whether or not the preexisting condition is caused by the plaintiff's voluntary conduct) where necessitated as a direct result of the subsequent exposure." (*Potter, supra,* 6 Cal.4th at p. 1009, fn. 27.)

Further on, the opinion elaborated: "[E]ven if a defendant negligently exposes a smoker to toxins that significantly increase the smoker's risk of cancer, that defendant is not liable for reasonably certain future medical monitoring costs unless the recommended monitoring calls for tests or examinations that are in addition to or different from the type of monitoring that the smoker should prudently undertake regardless of the subsequent toxic exposure. However, if additional or different tests and examinations are necessitated as a result of the toxic exposure caused by the defendant, then the defendant bears full responsibility for their costs. The costs of additional or different monitoring made necessary by the defendant's conduct should not have to be shared by the plaintiff since the plaintiff already remains responsible for any monitoring that is shown to be medically advisable due solely to his or her smoking or other preexisting condition." (*Potter, supra,* 6 Cal.4th at p. 1012, fn. 31.)

■ The standard instruction—BAJI No. 14.10.1—gave no guidance on preexisting conditions. Cassiar specially proposed a modification which would have added the *Potter* guidance, but Gutierrez vigorously opposed it as argumentative, "hopelessly confusing," and unsupported. In arguing lack of support, Gutierrez evidently meant that the evidence had shown asbestos exposure to be a concurrent or even independent cause of the need for medical monitoring, and that Cassiar had not established otherwise. The court heard lengthy debate and, while stating agreement in principle with

Cassiar's reading of *Potter*, said in the end it was wary of "getting into uncharted water," denied the modification and ruled to "leave it for argument." The court also denied a new trial motion later brought by Cassiar in part over this refusal.[1]

Against this common backdrop, Cassiar raises two contentions. First, there is insufficient evidence to support the monitoring costs since Gutierrez failed in his burden under *Potter* to show a need for additional or different monitoring. Second, a new trial is required for prejudicial error in the court having refused the modifying instruction. We reject the first argument and agree with the second.

## A.   *Substantial evidence*

We reject the substantial evidence claim because, on close examination, it is a miscast claim of instructional error.

■ A substantial evidence claim attacks a *finding of fact*, and an appellate court determines whether, reviewing the record in a light most favorable to the judgment, there is substantial evidence, contradicted or uncontradicted, to support the finding. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) ■ Here, under the given BAJI instruction and enumerated *Potter* criteria, the jury found it a reasonably certain consequence of asbestos exposure that Gutierrez would need medical monitoring valued at $37,240. *That* is the finding of fact before us, and Cassiar makes no effort to show it is unsupported by cost estimates, the frequency and types of tests, Gutierrez's actuarial life span, or other pertinent criteria. Failure to set forth all of the evidence on this point would be a waiver (*ibid.*) if it were the claim being made, but it is not.

---

[1]Cassiar's instruction would have followed BAJI No. 14.10.1 but with modifications (italicized) so that it allowed as damages: "The reasonable value of the cost of medically monitoring the plaintiff's condition, provided that you find, based upon reliable medical expert testimony, that the need for medical monitoring is the reasonably certain consequence of a plaintiff's toxic exposure *only and not the result of a preexisting condition,* and that the recommended monitoring is reasonable. In determining the reasonableness and necessity of monitoring, you should consider, (1) the significance and extent of the plaintiff's exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiff's chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection.

"*This is economic damage.*

"*While the need for medical monitoring is a detriment or harm, you may not award damages for such detriment or harm if the monitoring is shown to be medically advisable due to his or her smoking or other preexisting condition. The defendant is only liable for medical monitoring costs that are in addition to or different from the type of monitoring that the plaintiff should prudently undertake regardless of the asbestos exposure.*"

Rather, Cassiar claims insufficient evidence to show the awarded costs were *in·addition to or different from* what Gutierrez should have had anyway due to preexisting risk conditions caused by TB and decades of smoking. As will be seen (*post*), we will agree that this was a showing required by *Potter*. However, it is *not* what the jury found or was asked to find. Hence, the real issues posed by this claim are whether the jury was misinstructed and, if so, whether the error was prejudicial in light of, among other things, the strength of the evidence on additional or different monitoring needs.

Cassiar does also argue that the amount of costs should have been reduced by the value of screening services offered by CertainTeed to its former employees, and we could construe this as an attack on the finding actually made by the jury. However, there is no need to explore that question or the parties' debate about the effect of the collateral source rule. The issues are moot because we will hold that refusal of the requested instruction requires a reversal of the entire economic damages award. Also, evidence about the CertainTeed program and Gutierrez's eligibility to participate in it is concededly sketchy on this record and could differ on a retrial.

### B. *Requested instruction*

■ "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

■ Cassiar's requested instruction (fn. 1, *ante*) addressed its theory that any medical monitoring reasonably required by Gutierrez's asbestos exposure was already required by his preexisting lung conditions caused by smoking and TB. While the given, unmodified instruction (BAJI No. 14.10.1) correctly told jurors how to assess the reasonableness and necessity of monitoring (*Potter*, *supra*, 6 Cal.4th 965, 1009), it gave no guidance at all on the need to reduce damages, under *Potter*, for monitoring already required by preexisting conditions and therefore should have been supplemented (*Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th at p. 573).

The proposed modification was also a correct distillation of *Potter*. Gutierrez's unconvincing contrary argument is this: "[T]o the extent [the] instruction was intended to suggest . . . that medical-monitoring damages are unavailable when the plaintiff's toxic exposure is not the sole cause of the need for such damages, it was an incorrect statement of the law. As *Potter*

explains, a defendant should not be liable for medical monitoring of a plaintiff's preexisting condition *'that is unaffected by a subsequent toxic exposure negligently caused by the defendant.'* But the *Potter* court emphasized that a defendant will be held responsible for any increased or different monitoring *of the preexisting* condition necessitated as the direct result of the subsequent exposure." (Fns. omitted.)

Gutierrez misreads *Potter.* The passage he quotes does preclude liability for a "preexisting condition that is unaffected by a subsequent toxic exposure" and assigns to the defendant responsibility for "any increased or different monitoring of the preexisting condition" directly resulting from the later tort (*Potter, supra,* 6 Cal.4th at p. 1009, fn. 27), but Gutierrez goes too far in taking this to mean that anytime a preexisting condition is "affected" by the later tort, the defendant is liable. The opinion elsewhere makes it clear that the monitoring must be "additional or different"—that is, "in addition to or different from the type of monitoring" previously required (*id.* at p. 1012, fn. 31). The crucial distinction, in other words, is in the nature of the monitoring, not the nature of the harm. "[E]ven if a defendant negligently exposes a smoker to toxins that significantly increase the smoker's risk of cancer, that defendant is not liable for reasonably certain future medical monitoring costs unless the recommended monitoring calls for tests or examinations that are in addition to or different from the type of monitoring that the smoker should prudently undertake regardless of the subsequent toxic exposure." (*Ibid.*) This accords with the policy concern being addressed in that part of the opinion, which was to avoid "open[ing] the floodgates of litigation" (*id.* at p. 1009). If "the plaintiff already remains responsible for any monitoring that is shown to be medically advisable due solely to his or her smoking or other preexisting condition" (*id.* at p. 1012, fn. 31), he or she will have no incentive to sue for contribution from a subsequent tortfeasor who has caused no need for additional or different monitoring.

Gutierrez argues that the language of BAJI No. 14.10.1 requiring jurors to find medical monitoring a "reasonably certain consequence" of toxic exposure (fn. 1, *ante*; *Potter, supra,* 6 Cal.4th 965, 1009) adequately covers *Potter's* holding on preexisting conditions. It does not. Under the BAJI instruction and its incorporated *Potter* criteria, the jury here found it a "reasonably certain consequence" of asbestos exposure that Gutierrez would need medical monitoring valued at $37,240. This failed to convey *Potter's* dictate that the plaintiff must bear alone any amount of that sum which his or her preexisting conditions would already require; the recoverable amount must be new or different.

Accordingly, the proposed instruction was legally correct and not argumentative in form. If supported by substantial evidence, it was refused in error.

Most of the pertinent testimony about medical monitoring needs came from Gutierrez's pulmonary specialist, Dr. Carolyn Ray. She was not Gutierrez's treating physician but, at the instigation of his counsel, had examined him twice, once in October 1992 and again in October 1994. She learned he had smoked cigarettes from 1974 until 1992, except for two periods of a year or more in which he had quit, and in 1968 had a positive skin test for TB, for which he had then taken a long course of antibiotics.

Gutierrez complained of persistent arthritic pain in his knees and elbows, and by 1994 had had elbow surgery and switched to a less strenuous job at work, but he did not report any breathing or chronic cough problems, except to say in 1994 that he felt out of breath if he climbed stairs. Pulmonary function tests (PFT's) administered by Ray in both years, and the results of tests by others which she reviewed, were all within normal limits, and Gutierrez's lungs were clear. She did discern, from X-rays and computerized tomography (CT) scans, an abnormality in the upper left lobe of the lung called glanulomatous disease, an area of calcified lymph node which she felt was due to the TB and not attributable to asbestos exposure. This was more than a calcified old area, for it had "an infiltrate or a soft-tissue appearance around the calcified area that raise[d] the question of carcinoma"—i.e., of slow-growing malignancy. She also saw pleural plaques (more of them in 1994 than in 1992), which she attributed to asbestos exposure, and some interstitial markings or fibrosis which she believed were asbestos-related and not a result of smoking. She added, however, that PFT abnormalities "will also be affected by the patient's tobacco use." At that time, Gutierrez had normal lung function and no impairment.

Based on that assessment, Ray recommended a four-part monitoring regimen: physical examinations costing $125 to $150; PFT's costing $600 to $800; four-view chest X-rays costing $200 to $400; and CT scans costing $1,400 to $2,400. These were needed because Gutierrez had already shown asbestosis-related pleural disease, had a history of cigarette smoking and was at increased risk of disease progression and developing lung cancer. All measures would be annual except for the scans, which could be every two or three years absent an acute change in symptoms.

Ray was asked on cross-examination what monitoring she would recommend for someone with Gutierrez's lobe abnormality and smoking history, apart from exposure to asbestosis. The upper lobe abnormality itself (without asbestos or smoking), she replied, would require monitoring "[o]f some type"—perhaps a CT scan every two years—not for risk of TB itself, since he had undergone the antibiotic treatment, but due to the soft-tissue indication of potential malignancy. Chest X-rays would also be in order. The

smoking history, too, would justify CT scans every two years, particularly with the abnormality and concern over slow-growing cancer. Were Gutierrez to walk into her office today with the same lobe abnormality and smoking history, without asbestos exposure, she would be concerned about the abnormality and "want to follow it relatively closely. I don't want to miss cancer in somebody as young as Mr. Gutierrez." Physical examinations directed toward pulmonary function would also be recommended.

On redirect examination, Dr. Ray clarified that her recommendations took into account the total, unique medical picture Gutierrez had presented. She had "no medical way of taking Mr. Gutierrez apart" and isolating his exposures, injuries and risks, and she could not "apportion the need" for monitoring between them.

Dr. Michael Cohen, Cassiar's own pulmonary specialist, testified to similar findings, although he discerned no interstitial fibrosis, saw pleural plaques as "minimal" and not "extensive" (as Dr. Ray had indicated) and saw no increased risk of malignant mesothelioma. Cohen recommended monitoring Gutierrez's pulmonary health with PFT's and chest X-rays every two years. For a patient such as Gutierrez, with smoking history and upper lobe abnormality, he would recommend doctor visits and chest X-rays every year or two, without regard to occupational exposure to asbestos.

Clearly, the evidence more than substantially supported instruction on preexisting conditions and medical monitoring. It may be, as Gutierrez suggests, that the risks from his asbestos exposure will increase yearly while risks from his smoking diminish, until someday the smoking is no longer an independent factor. But this does not detract from the abundant evidence showing an overlap for now, and the prospects of his future needs in that situation were, in any event, not fully explored in the record before us.

Having found error in the refusal of the requested instruction, the remaining question is prejudice (Cal. Const., art. VI, § 13). ██ Prejudice is established if it seems probable that the error prejudicially affected the verdict, a determination which "depends heavily on the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury." (*Soule* v. *General Motors Corp., supra,* 8 Cal.4th at p. 580.) "[W]hen deciding whether an error of instructional omission was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581, fn. omitted.)

██ The omission here meant that Cassiar had no instruction to back its argument that much or perhaps all of the monitoring Gutierrez needed for his

asbestos exposure was already needed for preexisting medical conditions arising from smoking and TB, and the state of the evidence, as already discussed, raised serious question, from Gutierrez's own expert, whether any of the monitoring was not already needed. The closest instruction on point was the unmodified BAJI No. 14.10.1, which in effect told jurors that Cassiar was liable for *all* monitoring costs, as long as asbestos exposure was a causative factor. Under *Potter*, this was misleading in the extreme.

Gutierrez would have us find the error harmless in light of Cassiar's summation which, he writes, "presented [Cassiar's] 'medical-monitoring theory' to the jury 'without objection.' Jurors also considered, and rejected, Cassiar's argument that Mr. Gutierrez required monitoring no different from that recommended for conditions unrelated to his asbestos exposure. Under these circumstances, it can hardly be said that a modification of the medical-monitoring instruction would have in any way affected the outcome here." (Fns. omitted.) We disagree and find his analysis deceptive.

True, Cassiar's counsel did make the preexisting-condition argument without objection *at that time*. Counsel summarized Dr. Ray's testimony and urged that none of what she recommended was "new and different" from what Gutierrez would have needed already without the asbestos exposure.

However, counsel for Gutierrez then got up in rebuttal and effectively objected. He urged: "Ladies and gentlemen, there's no instruction that says that means they don't have to pay for medical monitoring that's reasonably necessary because of asbestos exposure. If there was such a jury instruction, perhaps that argument would make some sense in terms of what your task is. It really is an irrelevant situation. [¶] If someone is injured because of the tortious conduct or products of someone else, the fact that they are also going to go to the hospital in their lifetime for some other reason doesn't absolve the liability of the tortfeasor who caused an injury as well. And that is in the law, and that is what you're instructed, and that is what you're sworn to follow as the law. [¶] You're not legislators to change the law, you're judges of the facts to apply the law as it's given to you, the facts that you think exist. [¶] And there's undisputed testimony that Dr. Ray has said this man needs future medical monitoring. . . ."

This likely devastated the defense. Having won his fight against the modified instruction before the judge on the rationale that this theory was something for argument, not instruction, counsel for Gutierrez then did an about face before the jury, telling them the theory was "irrelevant," not approved by any instruction, and therefore outside the given law which it was their sworn duty to follow. The record screams with prejudice. (Compare this with *Soule* v. *General Motors Corp.*, *supra*, 8 Cal.4th 548, 582

[omission of instruction harmless where "neither plaintiff's counsel nor the court ever suggested" the omitted defense theory "was legally irrelevant"].)

Finally, there are indications that the jury, to the extent it thought the theory had any legal validity, may have been misled. Jurors deliberated for 10 days on this case alone and asked for read-backs of the relevant testimony by Drs. Ray and Cohen.

In conclusion, it appears reasonably probable the instructional error prejudicially affected that part of the verdict awarding economic damages. Gutierrez disputes this on a theory that the verdict does not disclose any breakdown in the $37,240 between medical monitoring costs and actual medical costs the jury may have awarded. While his case authority is not closely on point (*Conrad* v. *Ball Corp.* (1994) 24 Cal.App.4th 439, 444-445 [29 Cal.Rptr.2d 441] [offset waived by not having a special verdict differentiate between economic and noneconomic damages]), a bigger problem for him is the thin evidence—and a complete lack of argument or instruction—to support any costs *other than* those for medical monitoring. The court noted this when it refused to instruct on other medical expenses (BAJI No. 14.10), observing that no evidence of the cost of any past treatment had been provided. We will not speculate that the jury discerned and awarded damages for costs it was never asked or instructed to consider.

## II. *Denial of court-supervised fund*

*Potter* endorsed in principle the suggestion by some courts and commentators that medical monitoring damages might be better paid not in a lump sum to plaintiffs, but into a court-supervised fund from which the funds could be withdrawn for medical monitoring costs as accrued. The Supreme Court cited the policy advantages of encouraging regular medical monitoring, preventing use of the money for other purposes, limiting defendant liability to expenses actually incurred and reducing insurance costs of defendants and the public at large. (*Potter, supra,* 6 Cal.4th 965, 1010, fn. 28.)

Cassiar proposed this device below, offering to bear the costs of having a bank trustee administer the fund, with court intervention needed only in the event of a dispute. The court declined the proposition, and Cassiar claims error.

Our reversal of the economic damages award renders this dispute about the form of payment moot. We cannot know whether there will be a retrial or, if so, whether the size of the award and other circumstances might warrant a court-supervised fund to a greater or lesser extent than might now

appear on this record. For sake of possible retrial, we note only that *Potter* does not appear to mandate such a fund and thus implies that this is a matter left to a trial court's sound exercise of discretion.

### III. *Exclusion of coworker witness*

In its only claim potentially affecting the entire judgment, Cassiar complains of error and prejudice from the court having excluded proposed witness James Greeley, a coworker of Gutierrez whom Cassiar wanted to call. Cassiar notified Gutierrez of its intention to call Greeley on a Friday near the close of evidence, not having previously designated him as a witness. The court that next Monday heard argument on Gutierrez's objection to calling Greeley and, in the end, excluded him for not having been designated earlier.

The parties debate whether this was justified for failure to designate the witness months earlier, on a list prepared for voir dire of jurors, or under some inherent authority of the court. It appears undisputed that no discovery request had required the witness's disclosure, that Greeley was not to be called as an expert and that Cassiar, by notifying Gutierrez that Friday, had complied with a stipulation between the parties that each would give the other 48 hours notice of witnesses it proposed to call.

There is no need to explore those issues. Assuming error might be shown, Cassiar's failure to make an offer of proof or other proper record of Greeley's testimony defeats the claim. Counsel for Cassiar did at one point ask to make an offer of proof but then failed to do so after the court questioned its necessity and explained that its ruling was based on a failure to designate, not on relevance. Questioning the need for the offer does not appear to have been a refusal to hear one. (See, e.g., *Lawless* v. *Calaway* (1944) 24 Cal.2d 81, 91 [147 P.2d 604].) The court allowed the parties to make a complete record, even after its ruling, and was apparently not otherwise apprised of just what Greeley would say. (See, e.g., *Rangel* v. *Graybar Electric Co.* (1977) 70 Cal.App.3d 943, 950 [139 Cal.Rptr. 191].) Accordingly, the claim is not preserved. (Evid. Code, § 354, subds. (a) and (b).)

Alternatively, it fails on the merits. One function of an offer at trial is to provide a reviewing court with the means of assessing prejudice from any error (*People* v. *Schmies* (1996) 44 Cal.App.4th 38, 53 [51 Cal.Rptr.2d 185]), thus enabling a party challenging the judgment to meet its burden of affirmatively showing *reversible* error by an adequate record (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 574 [224 Cal.Rptr. 664, 715 P.2d 624]).

Nothing in this record properly shows, beyond surmise, what Greeley would have said. Cassiar has included in its appellant's appendix over 40 transcript pages of testimony given by Greeley in another trial 3 months after the verdict here, but the record does not show that this transcript was produced or considered on any posttrial motion. It is irrelevant to our review and cannot be considered (*People's Home Sav. Bank* v. *Sadler* (1905) 1 Cal.App. 189, 193-194 [81 P. 1029]; *In re Brittany H.* (1988) 198 Cal.App.3d 533, 554 [243 Cal.Rptr. 763]), and was improperly included in the appendix.

## DISPOSITION

That portion of the judgment awarding $37,240 in economic damages is reversed. The judgment is otherwise affirmed. Any retrial shall be limited to the issue of economic damages for costs of medical monitoring. Cassiar shall not recover costs on this appeal (Cal. Rules of Court, rule 26(c)) for the preparation of its appellant's appendix.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied June 12, 1998.