94 Cal.Rptr.2d 652 (2000)
79 Cal.App.4th 1019
LOCKHEED MARTIN CORPORATION et al., Petitioners,
v.
The SUPERIOR COURT of San Bernardino County, Respondent;
Roslyn Carrillo et al., Real Parties in Interest.
Baumac Corporation, Petitioner,
v.
The Superior Court of San Bernardino County, Respondent;
Roslyn Carrillo, Real Party in Interest.
Petro-Tex Chemical Corporation et al., Petitioners,
v.
The Superior Court of San Bernardino County, Respondent;
Roslyn Carrillo et al., Real Parties in Interest.
Nos. E025064, E025163, E025181.
Court of Appeal, Fourth District, Division Two.
April 11, 2000.
As Modified on Denial of Rehearing May 9, 2000.
Review Granted July 12, 2000.
*653 Holme Roberts & Owen and Linnea Brown; Gibson, Dunn & Crutcher, Robert S. Warren, Robert W. Loewen and Daniel S. Floyd, Los Angeles, for Lockheed Martin Corporation and Highland Supply Corporation.
*654 Payne & Fears and David Sweet, Irvine, for Highland Supply Corporation.
Bowman & Brooke and Anthony S. Thomas, Torrance; Seyfarth, Shaw, Fairweather & Geraldson, John D. Dwyer, Steven B. Katz and Carrie L. Daughters, Los Angeles, for FMC Corporation.
Nossaman, Guthner, Knox & Elliot and Patrick J. Richard, San Francisco, as Amicus Curiae on behalf of Petitioners.
Wood, Smith, Henning & Berman, David F. Wood, Ann G. Zuckerman and James C. Macdonald, Los Angeles; Brunick, Alvarez & Battersby and Leland P. McElhaney, San Bernardino, for BAUMAC Corporation.
Zevnik Horton Guibord McGovern Palmer & Fognani, John D. Fognani, San Diego, Michael John Miguel and K. Eric Adair for PETRO-TEX Chemical Corporation and El Paso Tennessee Pipeline Co.
Engstrom, Lipscomb & Lack, Walter J. Lack and Gary A. Praglin, Los Angeles; Masry & Vititoe and Edward L. Masry, Westlake Village; Girardi & Keese and Thomas V. Girardi, Los Angeles; Ward & Ward and Alexandra S. Ward, San Bernardino, for Real Parties in Interest.

OPINION
HOLLENHORST, Acting P.J.
We are called on to determine whether the trial court abused its discretion in certifying this case to proceed as a class action. We must conclude that it did because factors unique to each plaintiffs[1] entitlement to medical monitoring overwhelm the common issues of fact. Accordingly, we will grant the petitions.

FACTUAL AND PROCEDURAL BACKGROUND
The present action involves a putative class action which has been consolidated for pretrial proceedings with several individual actions under the caption In re Redlands Tort Litigation. The plaintiffs allege that the various defendants conducted manufacturing operations in Redlands beginning in 1954 that resulted in the discharge of dangerous chemicals, contaminating at least a portion of the city's groundwater. The plaintiffs seek on behalf of themselves and all other similarly situated: (1) damages in the form of a court-supervised medical monitoring program funded by defendants, and (2) punitive damages in connection with their alleged exposure to chemicals in the groundwater in the City of Redlands.
Plaintiffs moved for class certification of a "medical monitoring" class and a "punitive damage" class, defined as: "People who were exposed to water contaminated with any of the following chemicals: TCE, PCE, TCA, other solvents, Ammonium Perchlorate, Perchlorate, other unknown rocket fuel components and rocket fuel decomposition products, Beryllium, Carbon Tetrachloride, Vinyl Chloride, Hydrazine (and Hydrazine derivatives), Nitrosamines (and Nitrosamine derivatives), Epoxides (and Epoxide derivatives), Triazines (and Triazine derivatives), at levels at or in excess of the dose equivalent of the M.C.L. § (Maximum Contaminant Level), or in excess of the safe dose where there is no MCL, for some part of a day, for greater than 50% of a year, for one or more years from 1955 to the present" within specified geographical limits.[2]
Plaintiffs asserted that the geographic boundaries contained in the class definition established an ascertainable class, and the definition was reasonable because it was *655 based upon water contamination records as well as from defendant Lockheed's consultants. Not only residents within the defined area, but also workers and students could qualify as class members. One of plaintiffs attorneys stated that it was difficult to estimate the number of persons in the class in part because the University of Redlands is located in the proposed boundaries. Therefore, students living at the campus would be included in the class. The attorney's best estimate was that the class will include anywhere from 50,000 to 100,000 people.
The trial court certified the class, finding that as to the medical monitoring class the plaintiffs had met their burden of proof under Code of Civil Procedure section 382. "The Court finds that the plaintiffs have a realistic chance of success on the merits. [¶] Specifically, the Court finds that the plaintiffs have shown that there is a realistic chance that the defendants caused contaminants to be leaked into the water table beneath Redlands and that this contaminated water was served to the members of the proposed class."
The court also found that there is an ascertainable class, concluding that it was "not necessary to determine the levels of toxins received by each plaintiff at this time and that the geographic limits placed on the class are reasonable and related to the alleged contamination." The court concluded that there is a well-defined community of interest among members of the class and that common questions of law and fact predominate in the action. Although there were individual issues, the court concluded those issues were manageable.
The court concluded that the prerequisites contained in rule 23(a) of the Federal Rules of Civil Procedure (28 U.S.C.) (hereafter rule 23) had been met, specifically finding that: "1. The class consists of an estimated 50,000-100,000 people and therefore, the members of the class are so numerous that joinder of all members of the class as individual plaintiffs is impracticable. [¶] 2. The common questions of law and fact predominate over those that are individual to the plaintiffs. [¶] 3. The claims of the persons representing the class are typical of the class generally. [¶] 4. The persons acting as class representatives are able to fairly and adequately protect the interests of all members of the class and class counsel is able to adequately represent the class."
In the trial court's view, the medical monitoring claim also satisfied the requirements of either rule 23(b)(1)(A) or 23(b)(2). "Since the plaintiffs requested certification under FRCP 23(b)(2), this is the section under which the court certifies the medical monitoring claim. The court finds that the request for a medical monitoring system to be set up is a form of injunctive relief in that the plaintiffs are asking that one system be set up to share information, track the appearance and/or progress of any disease that is the result of exposure to contaminated water. The request is not a disguised attempt to recover compensatory damages. [¶] On this basis, the Court grants the motion to certify the medical monitoring class pursuant to FRCP 23(b)(2)."
The court also certified the punitive damage class making the same findings. The court indicated that it may certify a class under any section available, not only the section requested by the plaintiffs. Therefore, the court found that the punitive damages claim satisfied the certification requirement of rule 23(b)(2). It added that "[a]lthough there is some disagreement concerning whether punitive damages can be `appended' to a Rule 23(b)(2) claim, this court believes that when, as here, punitive damages are supplementary to the main injunctive claim, Rule 23(b)(2) may be used to certify the class as to the punitive damage claim."
Three petitions, consolidated for purposes of this decision, have been filed by defendants seeking to challenge this ruling. We issued an order to show cause *656 having concluded that writ relief is both available and necessary in this instance. (Blue Chip Stamps v. Superior Court (1976) 18 Cal.3d 381, 387, fn. 4, 134 Cal. Rptr. 393, 556 P.2d 755.)

DISCUSSION
Code of Civil Procedure section 382 authorizes class action lawsuits "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court...." In order to maintain a class action, certain prerequisites must be met, specifically, "the existence of an ascertainable class and a well-defined community of interest among the class members. [Citation.] The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (Richmond v. Dart Industries, Inc. (1981) 29 Cal.3d 462, 470, 174 Cal. Rptr. 515, 629 P.2d 23.)
Moreover, it must be shown that a substantial benefit both to the litigants and to the court will result, and the burden of that showing falls on the plaintiff. (City of San Jose v. Superior Court, (1974) 12 Cal.3d 447, 460, 115 Cal.Rptr. 797, 525 P.2d 701.) A class action cannot be maintained if each individual's right to recovery depends on facts peculiar to that individual. (Id., at p. 459, 115 Cal.Rptr. 797, 525 P.2d 701.)
An order certifying a class is reviewable for abuse of discretion provided that correct criteria were used. (Osborne v. Subaru of America, Inc. (1988) 198 Cal. App.3d 646, 654, 243 Cal.Rptr. 815.) If the trial court's decision is based on erroneous legal assumptions or it applied improper criteria we reverse even though there may be substantial evidence to support the court's order. (Richmond v. Dart Industries, Inc., supra, 29 Cal.3d 462, 470, 174 Cal.Rptr. 515, 629 P.2d 23.)
In applying these criteria to the facts of this case, we must conclude that the trial court abused its discretion by certifying this class because there is an insufficient community of interest.
Significant common issues of fact do exist in this case: whether and to what extent did defendants dispose of toxic chemicals; was defendants' conduct negligent or even malicious; the amount of contaminants that entered the groundwater; and, when, where, and at what levels were contaminants pumped by the city's wells entered into the domestic water system.[3] However, these common issues would be overwhelmed by the numerous inquiries necessary to establish each individual's claim to medical monitoring. Many courts, both California and federal, have found that mass tort actions for personal injuries are not appropriate for class treatment due to the plethora of individual factual issues regarding liability, causation, and damages. (Jolly v. Eli Lilly & Co. (1988) 44 Cal.3d 1103, 1123, 245 Cal.Rptr. 658, 751 P.2d 923.) This predominance of such individual issues is even more apparent in the present claim for medical monitoring. It would be necessary to introduce evidence as to each class member of his or her level of exposure to a range of chemicals, the individual's personal characteristics and health history including alternative risk factors, disease etiology, etc. In addition, the defendants have raised a statute of limitations defense so that evidence of a class member's knowledge of the contamination will be relevant. Such *657 individualized inquiries are dictated by the requirements of the substantive law regarding claims for medical monitoring. Thus, under prevailing authority, liability for medical monitoring is imposed for additional monitoring only beyond that which would otherwise be prudent in an individual case.
To examine the requirements of a medical monitoring claim, we first must look to our Supreme Court's decision in Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795. The court explained that "[i]n the context of a toxic exposure action, a claim for medical monitoring seeks to recover the cost of further periodic medical examinations intended to facilitate early detection and treatment of disease caused by a plaintiffs exposure to toxic substances." (Id., at pp. 1004-1005, 25 Cal.Rptr.2d 550, 863 P.2d 795.) It ultimately held that "the cost of medical monitoring is a compensable item of damages where the proofs demonstrate, through reliable medical expert testimony, that the need for future monitoring is a reasonably certain consequence of a plaintiffs toxic exposure and that the recommended monitoring is reasonable. In determining the reasonableness and necessity of monitoring, the following factors are relevant: (1) the significance and extent of the plaintiffs exposure to chemicals; (2) the toxicity of the chemicals; (3) the relative increase in the chance of onset of disease in the exposed plaintiff as a result of the exposure, when compared to (a) the plaintiffs chances of developing the disease had he or she not been exposed, and (b) the chances of the members of the public at large of developing the disease; (4) the seriousness of the disease for which the plaintiff is at risk; and (5) the clinical value of early detection and diagnosis. Under this holding, it is for the trier of fact to decide, on the basis of competent medical testimony, whether and to what extent the particular plaintiffs exposure to toxic chemicals in a given situation justifies future periodic medical monitoring." (Id. at p. 1009, 25 Cal.Rptr.2d 550, 863 P.2d 795.)
Potter emphasized that "toxic exposure plaintiffs may recover `only if the evidence established the necessity, as a direct consequence of the exposure in issue, for specific monitoring beyond that which an individual should pursue as a matter of general good sense and foresight.' "(Potter v. Firestone Tire & Rubber Co., supra, 6 Cal.4th 965, 1009, 25 Cal.Rptr.2d 550, 863 P.2d 795.) All four plaintiffs in Potter were long-term cigarette smokers, and the defendant complained that it should not be saddled with financing their long-term health care needs as a result of their voluntary exposure to smoking. The court responded that "there is no question that a defendant ought not to be liable for medical monitoring of a plaintiffs preexisting condition that is unaffected by a subsequent toxic exposure," but stated that the defendant may be held responsible for "any increased or different monitoring of the preexisting condition (whether or not the preexisting condition is caused by the plaintiffs voluntary conduct) where necessitated as a direct result of the subsequent exposure." (Id., at p. 1009, fn. 27, 25 Cal.Rptr.2d 550, 863 P.2d 795.) "[E]ven if a defendant negligently exposes a smoker to toxins that significantly increase the smoker's risk of cancer, that defendant is not liable for reasonably certain future medical monitoring costs unless the recommended monitoring calls for tests or examinations that are in addition to or different from the type of monitoring that the smoker should prudently undertake regardless of the subsequent toxic exposure. However, if additional or different tests and examinations are necessitated as a result of the toxic exposure caused by the defendant, then the defendant bears full responsibility for their costs. The costs of additional or different monitoring made necessary by the defendant's conduct should not have to be shared by the plaintiff since the plaintiff *658 already remains responsible for any monitoring that is shown to be medically advisable due solely to his or her smoking or other preexisting condition." (Id., at p. 1012, fn. 31, 25 Cal.Rptr.2d 550, 863 P.2d 795.)
Gutierrez v. Cassiar Mining Corp. (1998) 64 Cal.App.4th 148, 75 Cal.Rptr.2d 132, further illustrates that the nature and extent of medical monitoring costs for which a defendant may be liable are very much dependent factors peculiar to the individual plaintiff. In that case, the plaintiff was seeking to recover the costs of future medical monitoring due to asbestos exposure. Evidence was introduced suggesting that all of the monitoring was already needed for preexisting conditions arising from plaintiffs smoking and exposure to tuberculosis. The appellate court held that the trial court erred in refusing to instruct the jury regarding the effect of preexisting conditions on an award of economic damages to cover the costs of future medical monitoring.
Thus, we see that determining the right to medical monitoring in a class action is not a simple matter of showing that a certain number of people were exposed to toxic chemicals over a certain amount of time. The defendant's liability to pay for medical monitoring depends on an individual plaintiffs exposure, lifestyle, and any preexisting conditions. Here, to be included in a class requires a threshold level of exposure to contaminated water, but, contrary to plaintiffs assertion, such exposure does not determine a class member's right to medical monitoring. The nature and extent of the exposure to the chemicals varies widely. Exposure of neighbors varies given the amount of water they consumedone person might have consumed only bottled water while his neighbor during this same time period consumed tap water. On the other hand, one plaintiff might be able to show that defendants should pay the costs for cancer screening due to exposure to a certain chemical, whereas his next door neighbor whose exposure has been identical cannot recover these costs because he is a smoker, has suffered exposure to toxins in other circumstances, or has a genetic predisposition that otherwise calls for monitoring. In addition, the variety of chemicals and the range of possible diseases identified by the plaintiffs are extensive. The issue whether medical monitoring is available or appropriate for each medical condition or disease must be considered. Moreover, a class member's right to medical monitoring cannot be decided solely on answers he or she provides to a questionnaire. Rather, the entitlement to medical monitoring raises issues of fact which defendants have a due process right to litigate. The trier of fact would therefore be confronted with a multitude of factual questions which can only be resolved by individual proof given the number of chemicals involved, individual variations in exposure levels, the many different medical conditions and diseases involved, and the vast number of individual health backgrounds. Individual issues clearly predominate, making class certification inappropriate.
Kennedy v. Baxter Healthcare Corp. (1996) 43 Cal.App.4th 799, 50 Cal.Rptr.2d 736 supports our conclusion. In that action, two health care workers brought suit against a variety of manufacturers and sellers of latex gloves for injuries sustained by an entire class of health care workers due to allergic reactions to the protein in the gloves. The court of appeal affirmed the trial court's sustaining demurrers on the ground that the action was not amenable to class certification. "Individual sensitivities to latex proteins vary and may be exacerbated by the use of certain foods. Class members may have used the product over an extended period of time, giving rise to a possible statute of limitations defense in some cases. As one defendant phrased it, the case involved employees using different gloves manufactured by different defendants over different periods of time with different frequencies of use." (Id., at p. 806, 50 Cal.Rptr.2d *659 736.) The appellate court concluded that class treatment of the claim was inappropriate given the "veritable quagmire" of individual questions of causation and damages affecting each plaintiff. (Id., at p. 813, 50 Cal.Rptr.2d 736.) Although the plaintiffs in Kennedy v. Baxter Healthcare Corp. did seek equitable relief in the form of a medical monitoring fund, the court did not focus the individual issues inherent in such a cause of action. As we have discussed above, the existence of these claims here will only cause an exponential increase in the number and complexity of the individual fact questions that the trier of fact would have to consider.
Plaintiffs contend that these individual factors are not important in determining the suitability of a class action because they are seeking a court-supervised fund and not payment of monetary damages to individual class members. However, the remedy they seek does not avoid the reality that entitlement to that remedy depends upon factors unique to each individual class member. "[T]he community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining [the member's] individual right to recover following the `class judgment' determining issues common to the purported class." (City of San Jose v. Superior Court, supra, 12 Cal.3d 447, 459, 115 Cal.Rptr. 797, 525 P.2d 701; see also Brown v. Regents of University of California (1984) 151 Cal. App.3d 982, 198 Cal.Rptr. 916 [class action inappropriate to determine claims of fraud and negligence that university medical center failed to provide adequate coronary care].)
Recent pronouncements by the United States Supreme Court support our view that common issues do not predominate to allow certification of a class in mass toxic exposure cases such as ours. In Amchem Products, Inc. v. Windsor (1997) 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689, the court considered the "legitimacy under Rule 23 of the Federal Rules of Civil Procedure of a class-action certification sought to achieve global settlement of current and future asbestos-related claims. The class proposed for certification potentially encompasse[d] hundreds of thousands, perhaps millions, of individuals tied together by this commonality: Each was, or some day may be, adversely affected by past exposure to asbestos products manufactured by one or more of 20 companies." (Id., at p. 597, 117 S.Ct. 2231.) The court concluded that class certification was not proper under the requirement of rule 23(b)(3) that common questions predominate, noting that proposed class members were exposed to different products for different amounts of time, in different ways, and over different periods. The high court also opined that the "exposure-only" plaintiffs shared "`... little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories.'" (Amchem Products, Inc., supra, at p. 624, 117 S.Ct. 2231, italics added.)
To support their position that class certification is appropriate, plaintiffs rely on several federal decisions that certified classes for medical monitoring where there had been toxic exposure. (See O'Connor v. Boeing North American, Inc. (1998) 184 F.R.D. 311; Day v. NLO (S.D.Ohio 1994) 851 F.Supp. 869; Yslava v. Hughes Aircraft Co. (D.Ariz.1993) 845 F.Supp. 705; Boggs v. Divested Atomic Corp. (1991) 141 F.R.D. 58.) However, there are numerous federal decisions that have denied certification for medical monitoring. (See e.g., Barnes v. American Tobacco Co. (3d Cir. 1998) 161 F.3d 127; Boughton v. Cotter Corp. (10th Cir.1995) 65 F.3d 823; Reilly v. Gould, Inc. (M.D.Pa.1997) 965 F.Supp. 588.) In Barnes v. American Tobacco Co., *660 supra, for example, the court cogently summed up the difficulty in handling medical monitoring claims on a classwide basis. "[T]he requirement that each class member demonstrate the need for medical monitoring precludes certification. In order to state a claim for medical monitoring, each class member must prove that the monitoring program he requires is `different from that normally recommended in the absence of exposure.' [Citation.] To satisfy this requirement, each plaintiff must prove the monitoring program that is prescribed for the general public and the monitoring program that would be prescribed for him. Although the general public's monitoring program can be proved on a classwide basis, an individual's monitoring program by definition cannot. In order to prove the program he requires, a plaintiff must present evidence about his individual smoking history and subject himself to cross-examination by the defendant about that history. This element of the medical monitoring claim therefore raises many individual issues." (Id., at p. 146, fn. omitted.)
Thus, we are not impressed with the federal decisions cited by plaintiffs, particularly in light of the Supreme Court's decision in Amchem Products as well as contrary lower federal court authority. In addition, to the extent the federal decisions cited by plaintiffs certified class actions pursuant to rule 23(b)(1) or (2) they do not provide authority for certification here because these provisions do not require a finding of predominance of common issues as is required under California law.[4][5] (See Day v. NLO, supra, 851 F.Supp. 869 [class certified under rule 23(b)(2)]; see also Yslava v. Hughes Aircraft Co., supra, 845 F.Supp. 705 [the court held that certification was proper under rule 23(b)(2) as well as under rule 23(b)(3) because the relief sought, a court-supervised and preferred medical monitoring program, was injunctive].) "It is only in the absence of relevant state precedent that courts turn to federal law and rule 23 *661 for guidance." (Stephen v. Enterprise Rent-A-Car (1991) 235 Cal.App.3d 806, 814, 1 Cal.Rptr.2d 130, original italics.) Thus, there is no need to resort to federal authorities to determine the appropriate standards to apply where California law has clearly established the relevant requirement to maintain a class action lawsuit. (Kennedy v. Baxter Healthcare Corp., supra, 43 Cal.App.4th 799, 809, fn. 5, 50 Cal.Rptr.2d 736.) Similarly, rule 23(b)(2) cannot serve to provide an independent basis for certification in this state where the fundamental requirement of predominance of common issues has not been established. To the extent the trial court relied on this federal rule as an alternative basis for certification, it erred.
Defendants also challenge the order on other grounds. Specifically, they contend that the named plaintiffs cannot adequately represent the class because they are simultaneously pursuing individual damage claims. Defendants BAUMAC and FMC Corporation also contend that they are not properly joined as defendants in a class action suit because plaintiffs failed to demonstrate a realistic chance of establishing their liability. We have also not separately addressed the issue whether plaintiffs have established an ascertainable class. We find it unnecessary to address these other issues in light of our conclusion that plaintiffs failed to establish the existence of a community of interest to support class certification. In view of our holding that the medical monitoring class is not proper, the punitive damages class which was "appended" to it was also improperly certified.

DISPOSITION
The writ of mandate is granted. The trial court is ordered to vacate its order certifying the class.
Each party shall bear its own costs.
McKINSTER J., and WARD, J., concur.
NOTES
[1] For convenience and clarity we will hereafter refer to the parties by their designations in the trial court, that is, as plaintiffs and defendants.
[2] The class definition submitted by plaintiffs indicated that their counsels' review of water quality documents was ongoing, and that the definition would be amended if additional chemicals were identified.
[3] The City of Redlands uses surface water and groundwater in its water distribution system. The amount of water drawn from these sources varies over time depending on demand. Also because of variations in elevation within the city, Redlands has seven distinct pressure zones, and water sources vary for each pressure zone. In short, evidence of the Redlands water supply and distribution system is required to prove exposure of one person or a class.
[4] Rule 23 of the Federal Rules of Civil Procedure provides in part as follows:

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
"(1) the prosecution of separate actions by or against individual members of the class would create a risk of
"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests: or
"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."
[5] A rule 23(b)(2) class "serves most frequently as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment." (Baby Neal v. Casey (3d Cir.1994) 43 F.3d 48, 58-59.) "While 23(b)(2) class actions have no predominance or superiority requirements, it is well established that the class claims must be cohesive." (Barnes v. American Tobacco Co., supra, 161 F.3d 127, 143.) "`... Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a(b)(2) class are generally bound together through "preexisting or continuing legal relationships" or by some significant common trait such as race or gender.'" (Ibid., fn. 18.)