[No. A062164. First Dist., Div. Five. Apr. 26, 1994.]

BETTY CONRAD, Plaintiff and Appellant, v.
BALL CORPORATION, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III A.

**COUNSEL**

Gagen, McCoy, McMahon & Armstrong and Richard C. Raines for Plaintiff and Appellant.

Michel & Manning, Jeff M. Fackler and Peter J. Johnson for Defendant and Appellant.

## OPINION

KING, J.—

### I. INTRODUCTION

In this case we hold that a nonsettling personal injury defendant waives any right to an offset against a judgment for a calculated economic damages portion of a settling defendant's pretrial lump-sum payment by failing to propose a special verdict which would permit such calculation by differentiating between economic and noneconomic portions of the judgment.

### II. BACKGROUND

Betty Conrad's right hand was lacerated by a glass bottle manufactured by Ball Corporation, severing tendons and nerves.

Conrad testified as follows: She had purchased the bottle, which contained apple juice, at a supermarket. Upon returning home, she was about to place the bottle in a refrigerator, holding it with her right hand, when she heard an "air like sound" and felt wetness on her hand and feet. She "pulled in" at the bottle and it collapsed in her hand, causing the injury. She then dropped the bottle to the floor, and it shattered. Her husband later retrieved the pieces, most of which a glass technology consultant hired by Ball was able to reconstruct.

Conrad's expert witness, Glen Stevick, theorized that there were two contributing causes of the bottle's collapse: (1) a preexisting crack on the inside of the bottle "most of the way through the wall, maybe a half to three-quarters of an inch long," and (2) thinness of the glass in one area, which made it more likely the crack would fracture under pressure. He testified that Conrad's description of the "air like sound" and wetness on her hand and feet was consistent with a preexisting crack, and that without a preexisting crack the pressure Conrad described as having been placed upon the bottle could not have caused it to collapse. He also testified that a "squeeze test" used by Ball in the production of bottles—whereby a roller is applied to each bottle while it rotates—works well for detecting cracks where the pressure is applied, but "won't test for any flaws other than right where the roller is."

Ball's expert witnesses—Frank Duncan (an employee of a Ball subsidiary) and Ronald Caporali (the glass technology consultant)—testified that the breakage was caused by impact with a hard object, not by a preexisting

crack. They each described a telltale sign of a preexisting crack, called a "dwell mark," at the points where the crack stops, and said they found no evidence of dwell marks on the retrieved glass fragments.

Stevick conceded there was no physical evidence of a preexisting crack, but theorized this was because the crack was in an area where pieces of the broken bottle were missing from the reconstruction.

Before trial, Conrad settled with the seller (Lucky Stores, Inc.) and the bottler (H.A. Rider & Sons) for a cash payment of $50,000 and a guarantee of $125,000. A jury returned a special verdict of product liability against Ball in the sum of $275,000, finding that (1) there was a defect in the design or manufacture of the bottle, (2) the defect existed when the product left Ball's possession, (3) the defect was a cause of injury to Conrad, and (4) Conrad's injury was caused by a reasonably foreseeable use of the bottle. The court reduced the judgment by $50,000 based on the pretrial settlement. Ball filed a timely appeal from the judgment, challenging the sufficiency of the evidence, and Conrad filed a timely cross-appeal from the order reducing the judgment.

## III. DISCUSSION

### A. The Appeal*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. The Cross-appeal

■ On the cross-appeal, Conrad contends the court erred when it reduced her recovery by the full amount of the $50,000 pretrial settlement paid by the bottler and seller.

Under Civil Code section 1431.2, created in 1986 by Proposition 51, a personal injury defendant has no joint liability for *noneconomic* damages, but "shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault . . . ." (Civ. Code, § 1431.2, subd. (a).) In *Espinoza* v. *Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498], the court held this means that where a defendant makes a pretrial cash settlement with the plaintiff, a nonsettling codefendant who sustains a money judgment is entitled to a setoff only for that portion of the settlement attributable to economic damages, and is solely responsible for his or her share of the noneconomic damages. "Thus, that

*See footnote, *ante*, page 439.

portion of the settlement attributable to noneconomic damages is not subject to setoff. To do otherwise would, in effect, cause money paid in settlement to be treated as if it was paid as a joint liability. This could not properly be done on a verdict and we see no basis why it should be done on a settlement." (*Id.* at pp. 276-277; accord, *Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1706-1708 [27 Cal.Rptr.2d 62]; *In re Piper Aircraft* (N.D.Cal. 1992) 792 F.Supp. 1189, 1190-1191.)

In *Espinoza,* one defendant agreed to a lump-sum cash settlement, and the other sustained a judicial arbitration award divided into economic and noneconomic damages. (*Espinoza v. Machonga, supra,* 9 Cal.App.4th at p. 270.) The appellate court held the correct method of determining the offset against the award was to calculate the percentage of the award attributable to economic damages in relationship to the entire award, apply that percentage to the settlement amount to determine the portion of the settlement attributable to economic damages, and then reduce the amount of the award by the economic damages portion of the settlement. (*Id.* at p. 277.)

Here, as in *Espinoza,* the lump-sum settlement was undifferentiated as to economic and noneconomic damages. *Espinoza* gave Ball the right to a partial setoff to the extent an economic damage portion of the settlement could be calculated. Ball contends, however, that *Espinoza* was incorrectly decided—and the jury verdict in the present case was properly set off in the full amount of the pretrial settlement—because Code of Civil Procedure section 877, which predates Civil Code section 1431.2, mandates that a release given in good faith " 'to one or more of a number of tortfeasors claimed to be liable for the same tort . . . shall reduce the claims against the others in the amount stipulated by the release . . . or in the amount of the consideration paid for it whichever is the greater.' " We are persuaded, however, by the explanation in *Espinoza* that with the advent of Civil Code section 1431.2, "a personal injury plaintiff's valid 'claim' against one such tortfeasor for noneconomic damages can never be the liability of 'the others.' (Civ. Code § 1431.2, *supra.*) The payment of such a claim by one tortfeasor is not the payment of a claim for which 'the others' might ever be held jointly and severally liable. Thus, there is no longer any such claim 'against the others' to 'reduce.' " (*Espinoza v. Machonga, supra,* 9 Cal.App.4th at pp. 274-275.)[2]

We conclude that *Espinoza* prescribes the correct method for determining the setoff to which Ball was entitled. The problem here is that, unlike in

---

[2]We also find a modicum of support for this conclusion in the fact that the California Supreme Court denied a request for depublication of *Espinoza,* and then a month later depublished *Romero v. Derdendzhayana* (Oct. 27, 1992) B062996, which held that "[Code of Civil Procedure] section 877 requires an offset for preverdict settlements, regardless of the applicability of Civil Code section 1431.2, in order to prevent 'double recovery.' " If the depublication of *Romero* suggests the Supreme Court believed that opinion "to be wrong in

*Espinoza*, the special verdict did not specify economic and noneconomic damages, but merely awarded an undifferentiated lump sum of $275,000. Thus it is impossible to apply the *Espinoza* method, as we cannot calculate the percentage of the jury award attributable to economic damages.

Conrad suggests we can resolve this problem by assuming the jury awarded the full amount of economic damages she claimed at trial—$48,446.10—and using this amount in an *Espinoza* calculation. This would yield 17.62 percent as the percentage of the jury award attributable to economic damages, which, when applied to the settlement, would result in a setoff of $8,810 against the jury award. We do not, however, believe this is a satisfactory solution, for it requires wholly unsupported speculation as to the jury's decisionmaking process.

Rather, we conclude Ball waived any right to an offset by failing to propose a special verdict which differentiated between economic and non-economic damages. A defendant seeking an offset against a money judgment has the burden of proving the offset. (*Frankfort etc. Co.* v. *California etc. Co.* (1915) 28 Cal.App. 74, 86 [151 P. 176].) This is consistent with the general rule of evidence that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) As the party seeking the offset, Ball had the burden of proving the facts essential to it. Under *Espinoza*—which was decided before this trial—one of those facts was the percentage of the jury award attributable to economic damages. Ball could have proved that fact by proposing an appropriate special verdict, but failed

some significant way" (Grodin, *The Depublication Practice of the California Supreme Court* (1984) 72 Cal.L.Rev. 514, 515), the nearly contemporaneous order denying depublication of *Espinoza* would seem to suggest the Supreme Court approved of the case it chose to leave published. (*People* v. *Dee* (1990) 222 Cal.App.3d 760, 764 [272 Cal.Rptr. 208] [observing that Supreme Court had "made its views clear" by simultaneously denying review in one case and depublishing two other cases taking contrary position]; accord, *People* v. *Saunders* (1993) 5 Cal.4th 580, 607 [20 Cal.Rptr.2d 638, 853 P.2d 1093] (dis. opn. of Kennard, J.); Grodin, *supra*, at p. 521.)

We recognize that the Rules of Court state a depublished opinion "shall not be cited or relied on by a court or a party in any other action or proceeding . . . ." (Cal. Rules of Court, rule 977(a).) However, two recent opinions from the Supreme Court have cited unpublished opinions for reasons other than reliance upon them. In *Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242, 254, footnote 9 [19 Cal.Rptr.2d 698, 851 P.2d 1307], the majority cited a depublished concurring Court of Appeal opinion to indicate that the majority's analysis had been adapted from that opinion. In *People* v. *Saunders*, *supra*, 5 Cal.4th at page 607, a dissenting opinion cited two depublished Court of Appeal opinions for much the same reason we cite *Romero*—to address the effect of orders affecting the publication status of multiple decisions. The message from the Supreme Court seems to be that unpublished opinions may be cited if they are not "relied on." (Cal. Rules of Court, rule 977(a).) That is our situation here. We cite *Romero* not to rely on it, but to discuss the effect of the depublication order vis-à-vis the order denying depublication of *Espinoza*.

to do so. This precluded any offset, for want of supporting facts. The jury verdict was not properly subject to an offset in any amount.

## IV. DISPOSITION

The judgment is affirmed. The order reducing the amount of the judgment by $50,000 is reversed. Conrad shall recover her appellate costs.

Peterson, P. J., and Haning, J., concurred.

A petition for a rehearing was denied May 24, 1994, and the petition of appellant Ball Corporation for review by the Supreme Court was denied August 11, 1994.