[No. A064942. First Dist., Div. One. June 7, 1995.]

EMMA GREATHOUSE et al., Plaintiffs and Respondents, v.
AMCORD, INC., Defendant and Appellant.

**COUNSEL**

Brayton, Gisvold & Harley, Philip A. Harley, Alan R. Brayton, Deborah F. Schweizer and Berry & Berry for Plaintiffs and Respondents.

Liebman, Reiner, Nachison & Walsh, Kevin H. Louth and Craig Nelson for Defendant and Appellant.

**OPINION**

**NEWSOM, J.**—On September 22, 1988, the surviving wife and five children of Henry Greathouse (hereafter plaintiffs) filed a complaint against a lengthy series of defendants, including Amcord, Inc., doing business as Riverside Cement Company (hereafter Riverside), to recover damages for his death from asbestos-related disease. Before or during trial plaintiffs

settled for a total sum of $284,000 with 19 of the 20 defendants that were actually served. The case was submitted to the jury only as to the liability of Riverside, the one remaining defendant. In a special verdict, the jury awarded plaintiffs $289,174.10 in economic damages and $100,000 in non-economic damages. On the issue of comparative fault, the jury assigned 2 percent of the fault to Riverside and another 2 percent to the decedent. In a posttrial motion, the trial court granted Riverside a setoff of $56,800 against the verdict to reflect the portion of the pretrial settlement representing payment for economic damages.

The decedent, Henry Greathouse (hereafter Henry), moved to Stockton, California in 1944, a few years after his marriage to Emma Greathouse. In 1947 he began working as an apprentice hod carrier—the term given to workers who mix and prepare cement for plasterers. In 1960, he entered into a partnership with a licensed plastering contractor. When this business encountered financial difficulties, he began an association with another contractor and later entered into a third partnership in the late 1970's.

Although Henry was a contractor during most of his career, he always actively engaged in work at the jobsite. As a former hod carrier, he would mix the first couple of loads or relieve the hod carrier during his break. He seldom employed more than two or three workers on a continuing basis. At times he would be shorthanded or would take on small jobs himself requiring his own labor. He would commonly stay at a jobsite to do cleanup work or return in the evening to do this work.

The process of mixing cement produced clouds of dust and the work site was generally dusty. Cleaning up was also dirty work. Several of the products that Henry used apparently contained asbestos, and he would add raw asbestos to the mixer for certain kinds of work. The case against appellant Riverside was based entirely on one product—plastic gun cement. This product, which was designed for use in plaster guns, contained about 2 percent asbestos by volume as a pumping aid. Plaster guns had a tendency to clog up if supplied with ordinary cement. Riverside marketed the product from 1959 to the beginning of 1979. It did not sell any other product that contained asbestos.

Henry acquired a plaster gun around 1970 and used it until shortly before his death. According to his son, Eddie, "most of the big jobs required a gun." His family and coworkers provided an abundance of anecdotal evidence tending to prove that the gun was a regular feature at his jobsites. His eldest daughter remembers how heavy it was and how difficult to control. A big man standing six feet five inches and weighing three hundred fifty pounds,

Henry helped move the gun at jobsites and sometimes worked with it himself. His brother, John, and daughter, Vera, remembered seeing him mix cement for the gun. Though ordinary cement could be used, the device was usually supplied with the special gun cement.

A former vice-president of Riverside, Robert E. Hyche, testified that the company's operations were concentrated in Southern California. One product, white cement, was marketed throughout the west. Other products, including gun cement, were generally not marketed north of Fresno, although the company supplied one dealer in San Joaquin County, where Stockton is located. Nevertheless, the Greathouse plaintiffs were able to produce a chorus of testimony to the effect that Riverside cement was regularly supplied in Henry's jobs in Stockton and neighboring towns. His son and two relatives, who each worked with him for a period of years, and his wife and a daughter, who commonly visited jobsites, all testified to seeing bags of Riverside brand cement. His son, Eddie, recalled seeing large deliveries in a "double semitruck . . . .." But by all accounts, the product was not a dominant supplier but merely one of several sources of supply. Two or three other manufacturers in Northern California also marketed asbestos-containing gun cement.

Henry's brother-in-law, Teddy Willis, testified that Henry used Riverside plastic gun cement in a plaster gun. According to Willis, it was one of three or four brands "that was bought for the gun." His son, Eddie, recalled actually seeing him mix Riverside gun cement. On the other hand, his brother, John, candidly admitted that he had never seen him use a Riverside product in the mixing gun, though he thought it was done. Other witnesses were unable to specifically identify this product. All of Riverside's products were color coded and plastic gun cement had "bright green" letters. While Henry's family and relations, for the most part, remembered seeing the brand Riverside, they all failed to identify the use of a bag with bright green letters. Only one witness came close to such an identification. The son, Eddie, thought that the lettering on bags of Riverside cement was "dark, perhaps black or green."

■ As a first assignment of error, Riverside contends that the jury's verdict on the issue of causation is not supported by substantial evidence. It concedes the existence of sufficient evidence on the other elements of strict liability but argues that the jury could not reasonably find that its own product was a cause of Henry's asbestos-related illness. ■ In this appeal, we apply the familiar standard of review enunciated in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]: "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the

respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. . . . [T]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury."

■ The California Supreme Court has now definitively adopted the substantial factor test of causation for tort liability. (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872].) As stated in BAJI No. 3.76, "[a] cause of injury, damage, loss or harm is something that is a substantial factor in bringing about an injury, damage, loss or harm." The plaintiff generally has the burden of proving causation. (*Lineaweaver* v. *Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1415 [37 Cal.Rptr.2d 902].) ■ "In the context of asbestos litigation, a plaintiff must demonstrate exposure to a defendant's product and biological processes from the exposure which result in disease." (*Id.* at p. 1415-1416.) Riverside does not question the medical evidence linking Henry's fatal disease to asbestos but maintains that the evidence relating to his exposure to its own product was too minimal and speculative to constitute substantial evidence. (See *Dumin* v. *Owens-Corning Fiberglas Corp.* (1994) 28 Cal.App.4th 650 [33 Cal.Rptr.2d 702].) We disagree.

The record discloses an abundance of evidence from which the jury could infer that Henry commonly purchased Riverside's line of products and that he regularly used a plaster gun in the 1970's. Henry purchased Riverside plastic gun cement, according to the testimony of Teddy Willis, and was seen mixing Riverside plastic gun cement by his son, Eddie. In light of the evidence that, as a former hod carrier, Henry participated in the dusty work of mixing cement and that he assumed responsibility for cleaning up at the end of the day, the jury could infer that he was exposed to Riverside's product to such an extent that it was a substantial factor in bringing about his illness.

■ In a second assignment of error, Riverside challenges the trial court's determination of the amount of the preverdict settlement that should be set off against the verdict pursuant to Code of Civil Procedure section 877. As noted, plaintiffs settled with 19 other defendants for a total sum of $284,000. As to each settling defendant, the plaintiffs sought to allocate the settlement 20 percent to economic injuries and 80 percent to noneconomic injuries. A declaration of plaintiff's attorney states, "In most instances, the allocation is either contained in the release or confirming letters have been sent to the settling defendants, confirming this allocation." As we have seen, the jury awarded plaintiffs $289,174.10 in economic damages and $100,000

in noneconomic damages. This verdict in effect allocated the total damage award of $389,174.10 between economic and noneconomic damages by assigning 74.3 percent to economic damages and 25.7 percent to noneconomic damages.

■ It is now well established that Code of Civil Procedure section 877 allows Riverside to set off settlement payments only for economic damages against the jury's verdict. Settlement payments attributable to noneconomic damages are not subject to the setoff. (*Espinoza* v. *Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498]; *Conrad* v. *Ball Corp.* (1994) 24 Cal.App.4th 439, 442-444 [29 Cal.Rptr.2d 441]; *In re Piper Aircraft* (N.D.Cal. 1992) 792 F.Supp. 1189.) Code of Civil Procedure section 877 provides that a release given in good faith before verdict or judgment "to one or more of a number of tortfeasors claimed to be liable for the same tort . . . (a) . . . shall reduce the claims against the others in the amount stipulated by the release . . . or in the amount of the consideration paid for it whichever is the greater." However, Civil Code section 1431.2, subdivision (a), enacted by Proposition 51, section 4, establishes the principle that, in actions against multiple defendants based on comparative fault, the liability of an individual defendant for noneconomic damages cannot exceed the percentage of the noneconomic damages attributable to his fault. The statute provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

"[T]he relevant language of section 877(a) . . . presupposes the existence of multiple defendants jointly liable for the same damages. The settlement by one or more of several tortfeasors 'claimed to be liable for the same tort' reduces 'the claims against the others.' Under the scheme of purely several liability created by section 1431.2(a), however, '. . . a personal injury plaintiff's valid "claim" against one such tortfeasor for noneconomic damages can never be the liability of "the others" . . . . Thus, there is no longer any such claim "against the others" to "reduce." ' [Citation.]" (*Hoch* v. *Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 63 [29 Cal.Rptr.2d 615].)

■ In a posttrial motion for apportionment of settlement, the plaintiffs urged that, for the purpose of applying Code of Civil Procedure section 877, the trial court should attribute 20 percent of the preverdict settlements to economic damages and 80 percent to noneconomic damages pursuant to the

terms of the settlement agreements between plaintiffs and the settling defendants.[1] Riverside contended that the preverdict settlement should be allocated between economic and noneconomic damages according to the percentages reflected in the jury verdict, that is, 74.3 percent should be allocated to economic damages and 25.7 percent to noneconomic damages.

In an order filed January 26, 1994, the trial court accepted the plaintiffs' method of apportionment and ordered that "after deduction for prior settlements received, the amount due and owing by RIVERSIDE CEMENT COMPANY is $228,550.62 (representing $1,960.00 for noneconomic damages and $226,590.62 for economic damages.)" The trial court calculated the amount owing for economic damages by subtracting from $289,174.10 (the total award of economic damages) the sum of (a) $56,800 representing 20 percent of the settlement payments (20% × $284,000 = $56,800) and (b) 5,793.48 representing the 2 percent of the verdict for economic damages attributable to the comparative fault of the decedent Henry Greathouse (2% × $289,174.10 = $5,783.48). The award of $1,960 for noneconomic damages was based on the 2 percent of the $100,000 award for noneconomic damages for which Riverside was liable under Civil Code section 1431.2. (The calculation of $1,960 rather than $2,000 reflects a small error that need not concern us here.)

The alternative approach to allocation that Riverside favors was followed in *Espinoza* v. *Machonga, supra,* 9 Cal.App.4th 268. The plaintiff sued the Housing Authority of Fresno County and one Machonga for personal injuries. The housing authority settled with the plaintiff for $5,000. The plaintiff's case against Machonga went to judicial arbitration. The arbitrator awarded $6,242.94 in economic damages and $15,000 in noneconomic damages. The award for economic damages thus represented 29.388 percent of the total award of $21,242.94. After 30 days passed from the filing of the arbitrator's decision, the award became final. The trial court subsequently entered an "amended judgment" reflecting a setoff for the portion of the settlement with the housing authority attributable to economic damages. The court calculated this economic portion by multiplying the settlement by 29.388 percent, the percentage of the arbitration award reflecting economic damages. The plaintiff's economic damages were thus reduced by $1,467.77 ($5,000 × 29.388 = $1,467.77).

---

[1] Plaintiffs effectively concede the applicability of Civil Code section 1431.2 to this case. We note that the question of when an asbestos personal injury cause of action accrues for purposes of applying Civil Code section 1431.2 is pending before our Supreme Court. (*Coughlin* v. *Owens-Illinois, Inc.* (1993) 36 Cal.App.4th 165 [27 Cal.Rptr.2d 214], review granted Apr. 21, 1994 (S037837).) That question is not presented here, given plaintiffs' concession.

Affirming the trial court's method of allocation, the *Espinoza* decision holds that "the undifferentiated settlement figure" should be allocated to economic damages according to the percentage of the final award attributable to economic damages. (*Espinoza* v. *Machonga, supra*, 9 Cal.App.4th at p. 277.) In a footnote, the court reserved the question "of whether a trial court presiding over a good faith settlement hearing should make any such allocation if it is requested to do so. (See Code Civ. Proc., § 877.6 . . . .)" (*Id.* at p. 277, fn. 9.)

Like the *Espinoza* court, we need not consider the power of the trial court to allocate a settlement between economic and noneconomic damages at a good faith settlement hearing before trial conducted pursuant to Code of Civil Procedure section 877.6. Here, the issue of settlement allocation was raised after trial in a motion for "apportionment of settlement." We regard this motion as equivalent to the motion of the *Espinoza* plaintiff for an "amended judgment." (9 Cal.App.4th at p. 268.)

In plaintiffs' posttrial motion, the trial court was asked to rule on an issue that had already been submitted to the jury. The special verdict form asked the jury to find whether the defendant Riverside's product and/or its negligence was "a cause" of the death of Henry Greathouse. Then, the form required the jury to find "the total amount of damages, including economic and non-economic damages, if any, suffered by the plaintiffs, . . . and caused by either the defective product manufactured by the defendant . . . or defendant's negligence." The form provided separate blanks for "Economic Damages" and "Non-economic Damages."

The setoff provided by Code of Civil Procedure section 877 applies whenever the acts of multiple defendants "have combined to cause 'one indivisible injury.'" (*Hoch* v. *Allied-Signal, Inc., supra*, 24 Cal.App.4th 48, 63; Flahaven et al., Cal. Practice Guide: Personal Injury 1 (The Rutter Group 1991) ¶ 4:185.1, p. 4-80 (Flahaven).) Here, it is undisputed that that the jury verdict and the settlement both related exclusively to damages arising from the same "indivisible injury."[2] The jury verdict determined "the total amount of damages" from this indivisible injury, and the settlement reflected a negotiated agreement as to the liability of the settling defendants for the injury. By allocating the "total amount of damages" between economic and noneconomic damages, the jury made a determination as to the economic or noneconomic character of the indivisible injury which was directly applicable to the portion of the damages paid under the pretrial settlement.

---

[2] In other cases, pretrial settlement may involve elements of damages, such as attorney fees, that have a differential impact on various defendants. Our analysis does not reach the complexities presented by such cases.

As in other procedural contexts, the trial court was justified in inquiring only if there was a reasonable basis for the jury's allocation of total damages between economic and noneconomic damages. (Cf. Code Civ. Proc., § 629.) If the allocation was supported by substantial evidence, it should have allocated the settlement proceeds between economic and noneconomic damages according to the proportion reflected in the jury's verdict. Any other allocation would necessarily infringe on the factfinding power of the jury. (Cal. Const., art. I, § 16.)

We note, moreover, that the allocation of the settlement proceeds according to the proportions recited in a pretrial settlement agreement is inherently suspect. The negotiated allocation between economic and noneconomic damages will inevitably reflect a bias against economic damages that is prejudicial to a nonsettling defendant. The plaintiff has an interest in allocating as little as possible of the settlement to economic damages; the smaller the allocation to economic damages, the less the nonsettling defendants can claim as a credit against a verdict or judgment in the plaintiff's favor. (See Flahaven, *supra*, ¶ 4:185.22, p. 4-91.) The settling defendants have no incentive to oppose the plaintiff's allocation because they are entirely unaffected by it.

We do not question the power of the trial court to determine the amount of a settlement credit in a hearing under Code of Civil Procedure section 877.6 that satisfies due process standards. Thus, in *Arbuthnot* v. *Relocation Realty Service Corp.* (1991) 227 Cal.App.3d 682, 689 [278 Cal.Rptr. 135]), we remanded the case to the trial court for a hearing on the amount of the consideration paid by the settling defendant to the plaintiff at the time he entered into the settlement agreement. But we do not need to decide here when an allocation between economic and noneconomic damages negotiated between plaintiffs and settling defendants may be confirmed in a hearing conducted on "a proper adversarial basis . . . ." (See *Regan Roofing Co.* v. *Superior Court* (1994) 21 Cal.App.4th 1685, 1703 [27 Cal.Rptr.2d 62]; *Erreca's* v. *Superior Court* (1993) 19 Cal.App.4th 1475, 1494-1495 [24 Cal.Rptr.2d 156].) When the issue was brought before the court in plaintiffs' posttrial motion, it had already been decided in a fully adversary proceeding—the trial itself. The jury's apportionment of damages between economic and noneconomic damages should be binding on the trial court.

We conclude that Riverside was entitled to a setoff against the verdict for economic damages equal to 74.305 percent of the settlement or $211,026.20.

With this adjustment, the plaintiffs are entitled to a judgment against Riverside in the amount of $74,364.42.[3]

The judgment against Riverside is reduced to $74,364.42 and, as so modified, is affirmed. Riverside shall recover its appellate costs.

Strankman, P. J., and Dossee, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 31, 1995.

---

[3]Riverside's share of economic damages is $72,364.42, calculated as follows: total economic damages of $289,174.10 are reduced by (a) § 5,783.48 representing 2 percent of comparative fault attributed to Greathouse and (b) $211,026.20 representing economic damage portion of settlement (74.305% × $284,000.00 [total settlement]). Its share of noneconomic damages is $2,000 (2% x $100,000.00 [total noneconomic damages]).