Filed 3/11/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PAMELA MCARTHUR,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>KRISTI MCARTHUR, as Trustee, etc.,<br><br>　　　　Defendant and Appellant. | A137133<br><br>(Contra Costa County<br>Super. Ct. No. MSP1200053) |

In 2001, Frances E. McArthur created an inter vivos trust naming her three daughters—Deborah Tamisia, Kristi (Jensen) McArthur and Pamela McArthur—as coequal beneficiaries.[1]  Frances amended the trust instrument in 2011, allocating a greater portion of the trust property to Kristi and adding a provision requiring arbitration of disputes.  After Frances's death, Pamela sued Kristi, alleging financial elder abuse and claiming the 2011 amendment was invalid due to Kristi's undue influence and Frances's lack of testamentary capacity.  Kristi moved to compel arbitration of Pamela's claims under the terms of the 2011 trust amendment.  The trial court denied the motion because Pamela was not a signatory to the arbitration agreement.  We affirm.

## I.　BACKGROUND

In 2001, Frances created the Frances E. McArthur 2001 Living Trust, and provided that upon her death the trust estate would be divided equally among her three daughters or their issue.  In January 2011, the trust was amended to provide that, upon Frances's death, the trust estate would instead be distributed in accordance with a

---

[1] We hereafter refer to the trustor and parties by their first names given the family relationships and mutual surnames.  We intend no disrespect.

1

schedule of specific bequests with Kristi receiving the remainder. The amended trust document (2011 Trust) designated Kristi as a cotrustee and added a "Christian Dispute Resolution" provision that required mediation and if necessary arbitration of "any claim or dispute arising from or related to the Trust as amended."[2]

Frances died on August 12, 2011. In January 2012, Pamela filed a petition and action contesting the 2011 Trust, seeking removal of the trustee (Kristi), and suing for damages based on financial elder abuse. The pleading alleged that Kristi exercised undue influence over Frances when the 2011 Trust was executed, that Frances lacked testamentary capacity when she executed the amendment, and that Kristi committed financial elder abuse by wrongfully taking property from Frances "by way of donative transfer and testamentary bequests." Pamela sought a declaration that the 2011 Trust was void, compensatory and punitive damages, replacement of Kristi as trustee, and an order disqualifying Kristi as a trust beneficiary pursuant to Probate Code section 259.[3]

---

[2] "The Trustor and Co-Trustees [(Frances and Kristi)] are Christians and believe that the Bible commands them to make every effort to live at peace and to resolve disputes with each other in private or within the Christian church (see Matthew 18:15-20; 1 Corinthians 6:1-8). Therefore, the Trustor and Co-Trustees agree that any claim or dispute arising from or related to the Trust as amended shall be settled by biblically based mediation and, if necessary, legally binding arbitration before the Institute for Christian Conciliation[TM], a division of Peacemaker® Ministries, in accordance with its Rules of Procedure for Christian Conciliation (the 'Rules' found at www.peacemaker.net). To the extent authorized by the Rules, the provisions of California Code of Civil Procedure section 1283.05 (right to discovery in arbitration) are incorporated herein and made a part hereof. Judgment upon an arbitration decision may be entered in any court otherwise having jurisdiction. The Trustor and Co-Trustees understand that these methods shall be the sole remedy for any controversy or claim arising out of the Trust Agreement and expressly waive their right to file a lawsuit in any civil court against one another for such disputes except to enforce an arbitration decision. This Section shall also be binding on all successor trustees and benefices for the Trust as amended."

[3] As relevant here, the statute provides that a beneficiary under a will or trust shall not receive any property from a decedent's estate if found liable for physical abuse, neglect, or financial abuse of the decedent, who was an elder or dependent adult, and shall be deemed to have predeceased the decedent. (Prob. Code, § 259, subds. (a)(1), (c).)

Kristi filed a verified "Response and Objections" supported by multiple exhibits. She described a long history of Deborah's and Pamela's hostility toward her and mistreatment of Frances, which purportedly explained Frances's revision of her estate plan in January 2011. Kristi and the attorney who drafted the 2011 Trust averred that Frances was mentally lucid when she executed the amendment and clearly communicated her testamentary wishes. In June 2011, Frances reportedly met one-on-one with the attorney and confirmed her estate plan with a certificate of independent review.

Kristi moved to compel arbitration of Pamela's claims pursuant to the arbitration provision in 2011 Trust. The trial court issued a tentative decision, without receiving opposition briefing from Pamela, denying the motion because "[t]here is no evidence that the beneficiaries gave either their consent or consideration to the arbitration clause in order to achieve the status of beneficiary. Thus there is no binding agreement between the parties compelling arbitration." Kristi then filed a "Reply" to the tentative decision, citing *Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513 (*Suh*) (nonsignatories to an arbitration agreement may be bound by the agreement by equitable estoppel or on a third party beneficiary contract theory) and *Estate of Bodger* (1955) 130 Cal.App.2d 416, 424–425 (a trust is a third party beneficiary contract). On the eve of the hearing, Pamela filed an opposition brief citing *Schoneberger v. Oelze* (Ariz.Ct.App. 2004) 96 P.3d 1078 (*Schoneberger*),[4] which held that arbitration clauses contained in trust instruments are generally not enforceable against nonsignatory beneficiaries.

After the hearing on Kristi's motion to compel arbitration, the California Supreme Court decided *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223 (*Pinnacle*), which permitted enforcement of an arbitration provision in a condominium development's recorded declaration of covenants, conditions and restrictions. (*Id.* at pp. 231–232.) Kristi filed a supplemental brief addressing the new decision and the trial court heard further oral argument. The court then issued a September 26, 2012 written order denying the motion: "The doctrine of delegated

---

[4] Superseded by Arizona Revised Statutes section 14-10205. (See p. 5 & fn. 6 *post*.)

authority to consent articulated in *Pinnacle* is inapplicable to the case of a trust . . . . Instead, [Kristi] argued there was 'implied in fact' consent. No facts were presented to support such a claim, and this Court does not find that *Pinnacle* went that far in its decision. [¶] . . . [¶] Because there was no evidence that the beneficiaries of this Trust gave either their consent to or consideration for the arbitration provision in order to become beneficiaries, the motion to compel arbitration must be denied." The court denied Kristi's motion for reconsideration.

## II.    DISCUSSION

"A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.) A party seeking to compel arbitration of a dispute "bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability. [Citation.] Where . . . the evidence is not in conflict, we review the trial court's denial of arbitration de novo. [Citation.]" (*Pinnacle, supra,* 55 Cal.4th at p. 236.)

There are circumstances in which nonsignatories to an agreement containing an arbitration clause can be compelled to arbitrate under that agreement. (*Suh, supra,* 181 Cal.App.4th at p. 1513.) Whether an arbitration agreement is operative against a nonsignatory is likewise reviewed de novo. (*Id.* at p. 1512.)

A.    *Out-of-State Authority*

No published California decision addresses the precise issue before us—whether an arbitration clause in a trust document can bind a beneficiary.[5] Nor is there a great deal

---

[5] When the trial court issued its September 26, 2012 decision, the only published California appellate decision on point (finding that the beneficiary was not bound to arbitrate) had been superseded. (*Diaz v. Bukey* (May 10, 2011, B225548), review granted Aug. 10, 2011, S194150.) After the trial court here issued its decision, the Supreme Court transferred the *Diaz v. Bukey* case to the Second District Court of Appeal with directions to vacate and reconsider its decision in light of *Pinnacle, supra,* 55 Cal.4th 223. Kristi asked the trial court to reconsider its ruling in light of that transfer order, but

4

of case law on the subject from other jurisdictions. Two relatively recent out-of-state decisions, however, address the issue and may provide useful guidance. The Arizona Court of Appeal held that, although a trust instrument required arbitration, the beneficiaries were not bound to arbitrate because the trust document was not a "contract" subject to the state's general arbitration statute.[6] (*Schoneberger, supra,* 96 P.3d at p. 1079.) The Texas Supreme Court held, based on the wording of that state's arbitration law, that a trust beneficiary can be bound to arbitrate whether or not the trust document is considered to be a contract. (*Rachal v. Reitz* (Tex. 2013) 403 S.W.3d 840, 842 (*Rachal*).)

*Schoneberger* arose from a suit by two beneficiaries of irrevocable inter vivos trusts against the settlors and trustees, alleging mismanagement and dissipation of trust assets. (*Schoneberger, supra,* 96 P.3d at pp. 1079–1080.) As we have noted, the court held an arbitration provision in the trust documents was unenforceable under the Arizona general arbitration statute, which applied (with respect to predispute arbitration agreements) to "a provision in a *written contract* to submit to arbitration any controversy thereafter arising between the parties." (Ariz. Rev. Stat. § 12-1501, italics added; *Schoneberger*, at pp. 1079, 1082.) The court found the statutory language determinative: "Consistent with the wording of [Arizona Revised Statutes section] 12-1501, Arizona courts have recognized that the fundamental prerequisite to arbitration is the existence of an actual agreement or contract to arbitrate. [Citations.]" (*Schoneberger*, at p. 1082.) The court further noted that under Arizona law, "an inter vivos trust is not a contract," and that it had previously "discussed the distinctions between a trust and a contract. We explained that a beneficiary of a trust receives a beneficial interest in trust property while

the court declined. The Second District subsequently dismissed the *Diaz v. Bukey* appeal without issuing a new opinion pursuant to a stipulation of the parties. Citation to this case is for purposes of factual context only. (See Cal. Rules of Court, rule 8.1115(a), (b); *Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 443–444, fn. 2 [discussing citation to unpublished opinions for reasons other than reliance upon them].)

[6] The Arizona Legislature subsequently enacted Arizona Revised Statutes section 14-10205, which provides: "A trust instrument may provide mandatory, exclusive and reasonable procedures to resolve issues between the trustee and interested persons or among interested persons with regard to the administration or distribution of the trust."

the beneficiary of a contract gains a personal claim against the promissor. Moreover, a fiduciary relationship exists between a trustee and a trust beneficiary while no such relationship generally exists between parties to a contract. [Citation.] . . . Drawing on the Restatement (Second) of Trusts (1959), we further noted: . . . 'The creation of a trust is conceived of as a conveyance of the beneficial interest in the trust property rather than as a contract.' [Citation.]" (*Schoneberger*, at pp. 1082–1083.) Since the arbitration provision was contained in a trust, it was not enforceable against the nonsignatory beneficiaries under then applicable state law, regardless of the settlor's intent or the trustee's consent to arbitration.[7] (*Id.* at pp. 1083–1084.)

The Texas Supreme Court reached a different conclusion based on statutory language and trust beneficiary conduct in a case where an irrevocable inter vivos trust beneficiary sued the trustee for misappropriation of trust assets. (*Rachal, supra,* 403 S.W.3d at p. 842.) The court held that an arbitration provision in the trust *was* enforceable against the beneficiary under the Texas Arbitration Act, which applied, like California's statute, to a " 'written agreement' " to arbitrate. (*Rachal,* at pp. 844–845, quoting Tex. Civ. Prac. & Rem. Code § 171.001(a); *Rachal,* at p. 849 [noting similarity

---

[7] *In re Calomiris* (D.C. 2006) 894 A.2d 408 followed *Schoneberger*'s reasoning in holding that a former District of Columbia arbitration law did not apply to a testamentary trust created pursuant to the terms of a will that included an arbitration provision applicable to the trust. Like *Schoneberger,* the District of Columbia Court of Appeal relied on the arbitration law's express reference to an arbitration "provision in a written contract" (*In re Calomiris,* at p. 409, quoting D.C. Code former § 16-4301), and its conclusion that a will is not a contract (*In re Calomiris,* at p. 410). However, enforceability of the arbitration provision was not decided. Rather, the court dismissed the interlocutory appeal because the arbitration law at issue—a law authorizing immediate appeals of orders denying arbitration—applied only where the motion to compel was based on an arbitration provision in a written contract. (*Id.* at pp. 410–411; D.C. Code former §§ 16-4301, 16-4317(a)(1).) The District of Columbia arbitration law has since been substantially revised and now requires enforcement of "[a]n agreement contained in a record to submit to arbitration any existing or subsequent controversy arising between the parties to the agreement." (D.C. Code § 16-4406(a); see *Bank of America, N.A. v. District of Columbia* (D.C. 2013) 80 A.3d 650, 661, fn. 11 [discussing 2008 revision of the arbitration law].)

6

between Tex. & Cal. arbitration laws].) Noting that the Texas statute elsewhere referred to the law of "contract," the *Rachal* court concluded that the Legislature intended "written agreement" to have a different meaning from "contract." (*Rachal,* at p. 845.) It reasoned that "written agreement" was broader than "contract" and included any agreement that was supported by mutual assent. (*Ibid.*)

The *Rachal* court then found the necessary element of mutual assent not in the written agreement itself, but under the doctrine of "direct benefits estoppel." (*Rachal, supra,* 403 S.W.3d at pp. 845–846.) "[A] beneficiary who attempts to enforce rights that would not exist without the trust manifests her assent to the trust's arbitration clause. . . . [¶] Here, [the plaintiff beneficiary] both sought the benefits granted to him under the trust and sued to enforce the provisions of the trust. . . . [This] conduct indicated acceptance of the terms and validity of the trust." (*Id.* at p. 847, fn. omitted.)

Other courts have similarly concluded that a beneficiary who seeks to enforce rights under a trustee's contract with a third party may be compelled to arbitrate the dispute pursuant to an arbitration clause in the contract: "[the beneficiary] cannot simultaneously assert a claim against [the third party] based on the [contract] and seek to repudiate the arbitration clause in the [contract]." (*In re Blumenkrantz* (N.Y.Surr.Ct. 2006) 824 N.Y.S.2d 884, 888; see also *In re Jean F. Gardner Amended Blind Trust* (Wash.Ct.App. 2003) 70 P.3d 168, 238–239; *Smith v. Multi-Financial Securities Corp.* (Colo.Ct.App. 2007) 171 P.3d 1267, 1273–1274.) The *Schoneberger* court also recognized that a nonsignatory may be barred from avoiding arbitration if he has claimed or received some direct benefit from the agreement containing the arbitration clause. (*Schoneberger, supra,* 96 P.3d at p. 1081.)

Here, Pamela has not accepted benefits under the 2011 Trust nor has she attempted to enforce rights under the amended trust instrument. Instead, Pamela argues the 2011 Trust is invalid and seeks to have it set aside. *Rachal* acknowledges that a "beneficiary may disclaim an interest in a trust. [Citations.] And a beneficiary is also free to challenge the validity of a trust: conduct that is incompatible with the idea that she has consented to the instrument. [Citation.] Thus, beneficiaries have the opportunity

to opt out of the arrangement proposed by the settlor" and consequently to not be bound by the arbitration provision. (*Rachal, supra*, 403 S.W.3d at p. 847.) We agree.

Kristi argues that Pamela *has* accepted the benefits of the 2011 Trust: "[Pamela] manifested implied consent through the trust contest itself. She could have chosen to take nothing from the trust instrument, attacking [it in] its entirety. Instead, she sought to *establish* the trust terms prior to its last amendment." This argument conflates "the trust" created by Frances in 2001 with the 2011 Trust—the only trust instrument containing an arbitration clause. It is illogical to suggest that Pamela's claim of entitlement to benefits under "the trust" as it existed *before* the 2011 amendment amounts to acceptance of an arbitration clause first appearing in the 2011 amendment, a document she specifically challenges as invalid.

Kristi also argues that she produced undisputed evidence establishing the validity of the trust in support of her motion to compel arbitration and, because Pamela failed to dispute Kristi's evidence or produce conflicting evidence, Pamela has forfeited her opportunity to contest the validity of the trust. But the validity of the 2011 Trust has not been adjudicated by virtue of the motion to compel arbitration or otherwise. And even assuming the validity of the 2011 Trust were to be upheld, the arbitration clause in the trust would nevertheless be unenforceable against Pamela unless and until she accepts or seeks to enforce benefits under the 2011 Trust. Insofar as the record before us discloses, she has not done so. Since Pamela has done nothing to manifest her assent to the terms of the 2011 Trust, we find that she cannot be bound to its arbitration provision by estoppel.

B.    *Application of* Pinnacle

We next must complete the assignment originally given by the Supreme Court to our colleagues in *Diaz v. Bukey, supra,* B225548: consider the application of *Pinnacle* to these circumstances. Kristi insists that *Pinnacle* mandates that arbitration be compelled here because the Supreme Court held that an entity was bound by an arbitration clause even though the entity did not exist when the clause was promulgated and did not

subsequently consent to the clause. We agree with the trial court that *Pinnacle* is materially distinguishable.[8]

In *Pinnacle*, the arbitration provision appeared in a recorded declaration of covenants, conditions and restrictions (CC&R's) for a condominium development. (*Pinnacle, supra,* 55 Cal.4th at pp. 231–232.) Consistent with a detailed statutory scheme, the Davis-Stirling Common Interest Development Act (Davis-Stirling Act),[9] the development project's CC&R's were approved by a state regulator, and each condominium owner agreed to be bound by the recorded CC&R's at the time of purchase. The CC&R's provided for the creation of a homeowners' association consisting exclusively of the condominium owners who had assented to the CC&R's, and the arbitration provision purported to bind the association as well as the individual condominium owners in any construction defect suit against the developer. The association opposed the developer's motion to compel arbitration of construction defect claims. (*Pinnacle*, at pp. 232–234, 248.)

Although the Supreme Court discussed in some detail the "contractual nature" of the CC&R's (*Pinnacle, supra,* 55 Cal.4th at pp. 237, 239–240),[10] the holding of *Pinnacle* rests heavily on elements of the Davis-Stirling statutory scheme, including consumer

---

[8] Because we find *Pinnacle* otherwise inapplicable, we need not decide whether reference to a "written agreement" in Code of Civil Procedure section 1281, rather than a "contract," is sufficient to permit us to disregard in the trust context the Supreme Court's frequent statements that " '[g]eneral principles of contract law determine whether the parties have entered a binding agreement to arbitrate' [Citations]." (*Pinnacle, supra,* 55 Cal.4th at p. 236.)

[9] Civil Code former section 1350 et seq.; see *Pinnacle*, *supra,* 55 Cal.4th at pages 232, 236–239, 242–243. Effective January 1, 2013, and operative January 1, 2014, the Davis-Stirling Act was reorganized and recodified as Civil Code section 4000 et seq. (See Stats. 2012, ch. 180, §§ 1, 2.)

[10] *Pinnacle* involved arbitration pursuant to the Federal Arbitration Act, which applies to "[a] written provision in . . . a *contract* evidencing a transaction involving commerce to settle by arbitration a controversy" (9 U.S.C. § 2, italics added). Unlike the party seeking arbitration in *Pinnacle*, Kristi does not argue that the arbitration clause at issue here is enforceable under the Federal Arbitration Act.

9

protection elements:[11] "[T]he Legislature has crafted a statutory scheme providing for the capacity of a developer to create a condominium development subject to covenants and restrictions governing its operation and use. *There appears no question that, under the Davis-Stirling Act, each owner of a condominium unit either has expressly consented or is deemed by law to have agreed to the terms in a recorded declaration.* As the exclusive members of an owners association, the owners have every right to expect that the association, in representing their collective interests, will abide by the agreed-upon covenants in the declaration, including any covenant to invoke binding arbitration as an expeditious and judicially favored method to resolve a construction dispute, in the absence of unreasonableness. That a developer and condominium owners may bind an association to an arbitration covenant via a recorded declaration is not unreasonable; indeed, such a result appears particularly important because (1) the Davis-Stirling Act confers standing upon an association to prosecute claims for construction damage in its own name without joining the individual condominium owners (Civ. Code, [former]

---

[11] The court noted that "the Legislature has provided various protections to help insure that condominium purchasers know what they are buying into. For example, developers and subsequent sellers must provide copies of the declaration and other governing documents to prospective purchasers. (Bus. & Prof. Code, § 11018.6; Civ. Code, [former] § 1368, subd. (a).) Additionally, developers generally must provide prospective purchasers with a copy of the Department of Real Estate's public report approving the particular condominium development and a copy of a statutory statement outlining general information regarding common interest developments. (Bus. & Prof. Code, § 11018.1, subds. (a), (c); see Bus. & Prof. Code, § 11018.2.) . . . [¶] Another significant way in which the [Davis-Stirling] Act promotes stability and predictability is by providing that the 'covenants and restrictions in the declaration shall be enforceable equitable servitudes, *unless unreasonable*, and shall inure to the benefit of and bind all owners of the separate interests in the development.' (Civ. Code, [former] § 1354, subd. (a), italics added.) . . . [¶] . . . [¶] Moreover, settled principles of condominium law establish that an owners association, like its constituent members, must act in conformity with the terms of a recorded declaration. (See Civ. Code, [former] § 1354, subd. (a); [citations].) . . . That a declaration operates to bind an association is both logical and sound, for the success of a development would be gravely undermined if the association were allowed to disregard the intent, expectations, and wishes of those whose collective interests the association represents. [Citations.]" (*Pinnacle, supra,* 55 Cal.4th at pp. 238–239.)

10

§ 1368.3) and (2) as between an association and its members, it is the members who pay the assessments that cover the expenses of resolving construction disputes. Given these circumstances, an association should not be allowed to frustrate the expectations of the owners (and the developer) by shunning their choice of a speedy and relatively inexpensive means of dispute resolution. Likewise, condominium owners should not be permitted to thwart the expectations of a developer by using an owners association as a shell to avoid an arbitration covenant in a duly recorded declaration. [Citation.]" (*Pinnacle, supra,* 55 Cal.4th at p. 241, italics added.)

The Supreme Court analogized the *Pinnacle* case to *Ruiz v. Podolsky* (2010) 50 Cal.4th 838 (*Ruiz*) (another case Kristi relies on in this appeal), which also involved a statutory scheme that justified flexibility in binding nonsignatories to arbitration clauses. "[T]he Legislature can . . . provide for the reasonable delegation of authority to consent. ([*Ruiz,*] at pp. 852–854.) [¶] In *Ruiz* . . . we addressed the operation of Code of Civil Procedure section 1295, which allowed, but did not require, a patient to contract with a health care provider to resolve all medical malpractice claims through binding arbitration. The question presented was whether an arbitration agreement signed by a patient applied to the resolution of wrongful death claims, which are not considered derivative of a patient's claims, even though the wrongful death claimants were not themselves signatories to the arbitration agreement. (See *Ruiz*, at p. 841.) After observing that the statute intended to create 'a capacity of health care patients to bind their heirs to arbitrate wrongful death actions,' we found that binding the heirs 'does not in any sense' extinguish or restrict their claims, 'but merely requires that the claims "be resolved by a common, expeditious, and judicially favored method." ' (*Id*. at p. 852.) We firmly rejected the argument that a rule permitting a person to bind his or her adult children to arbitration would violate the state constitutional right to a jury trial. (Cal. Const., art. I, § 16.) As we explained, *'the Legislature may devise reasonable rules in civil litigation to permit the delegation to another party of the power to consent to arbitration instead of a jury trial*. . . . In the present case, the Legislature by statute has created the right of certain heirs to a wrongful death action and may also by statute place reasonable conditions on

11

the exercise of that right.' (*Ruiz*, at p. 853.)" (*Pinnacle, supra,* 55 Cal.4th at pp. 240–241, italics added.)

Here, there is no similar statutory scheme that would require that a trust beneficiary be bound by an arbitration clause in a trust instrument. Unlike Arizona Revised Statutes section 14-10205, enacted following *Schoneberger*, our Probate Code contains no specific legislative authorization for predispute trust arbitration provisions, despite otherwise establishing specific remedies and procedures for trust beneficiaries.[12] We find the doctrine of delegated authority to consent articulated in *Pinnacle* inapplicable in the context of a trust.

C.    *Other Contract Theories*

Kristi argues California courts have characterized trusts as contracts between settlors and trustees, and contends that because the trusts are formed for the benefit of the trust beneficiaries they should be enforceable against nonsignatory beneficiaries as with other third party beneficiary contracts. Older California decisions discuss trust documents as contracts between settlors and trustees *as to the terms of the trustees' services*, in particular, the rate of compensation for the trustees' services. (See *Estate of Bodger, supra,* 130 Cal.App.2d at pp. 417, 424–426 [court cannot reduce trustee compensation on ground that compensation provided for in trust document is excessive]; *Estate of Guasti* (1953) 117 Cal.App.2d 612, 614–616 [applying contract interpretation law to trust provision for compensation of trustee]; *Estate of Whitney* (1926) 78 Cal.App. 638, 648–649 [trustee not entitled to greater compensation than provided in trust document].) Even if these cases remain good law,[13] the arbitration clause in the trust document here is not consequently enforceable against Pamela as a third party beneficiary. Although Kristi asserts generally that contractual arbitration clauses are

---

[12] Cf. Probate Code section 9621 (authorizing estate personal representative to enter into a written agreement to submit postdispute third party claim to arbitration; such an agreement must be filed with, and approved by, the court).

[13] See *Estate of Bodger, supra*, 130 Cal.App.2d at p. 425 (relying in part on Civ. Code, former § 2218, which described a trust as a contract); Stats. 1986, ch. 820, § 7, p. 2730 (repealing Civ. Code, former § 2218).

enforceable against third party beneficiaries of the contract, the case law in fact requires that the third party *claim* benefits or rights under the contract before he or she will be bound to arbitrate.[14]  (See *Suh, supra,* 181 Cal.App.4th at pp. 1513–1514 [anesthesiologists not bound by arbitration clause in contract between their medical group and a hospital because they never benefited from the contract by working for the hospital in the relevant time period]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2013) ¶ 5:276.4a, p. 5-198.1 (rev. #1, 2013) [discussing *Suh* and stating, "there was no evidence that the anesthesiologists received benefits under the agreement[; t]herefore, the anesthesiologists were not third party beneficiaries and were not required to arbitrate"]; see also *In re Jean F. Gardner Amended Blind Trust, supra,* 70 P.3d at p. 239 [trust beneficiary seeking to enforce rights under contract between trustee and third party bound by arbitration clause as third party beneficiary of the contract]; *Smith v. Multi-Financial Securities Corp., supra,* 171 P.3d at pp. 1273–1274 [same].)

---

[14] Kristi also cites scholarly analyses in support of the third party beneficiary contract view of trusts.  (See Langbein, *The Contractarian Basis of the Law of Trusts* (1995) 105 Yale L.J. 625, 627, 646, 650–651; Bruyere & Marino, *Mandatory Arbitration Provisions: A Powerful Tool to Prevent Contentious and Costly Trust Litigation, But Are They Enforceable?* (2007) 42 Real Prop. Prob. & Tr. J. 351, 361–363; Strong, *Arbitration of Trust Disputes: Two Bodies of Law Collide* (2012) 45 Vand. J. Transnat'l L. 1157, 1177 (hereafter Strong).)  One of these articles suggests (without resolving the issue) that it may be appropriate to require arbitration of a beneficiary's challenge to the *validity* of a trust on the ground of the settlor's lack of capacity or undue influence over the settlor. (Strong, at p. 1221.)  However, cases the article cites in support of the argument involve challenges to the validity of a contract by *signatories* to the contract, not by nonsignatory third party beneficiaries to the contract.  (See Strong, at pp. 1221–1223 & fns. 334–335, citing *Prima Paint v. Flood & Conklin Mfg.* (1967) 388 U.S. 395, 402–407 [signatory's fraudulent inducement of contract claim subject to arbitration where no specific claim that arbitration agreement was fraudulently induced]; *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 445–446 [signatory's illegal contract claim subject to arbitration where validity of arbitration agreement was not specifically challenged].)

13

D.     *Policy Arguments*

Finally, Kristi urges that public policy considerations favor arbitration of trust disputes (see, e.g., Strong, *supra,* 45 Vand. J. Transnat'l L. at pp. 1181–1187; see fn. 14 *ante*).  Noting that the Arizona Legislature abrogated the *Schoneberger* holding by statute, she contends that there is a national trend toward allowing arbitration in the trust context, and urges us to follow this "trend."  These are arguments best addressed to the Legislature, not to this court.  Moreover, " '[e]ven the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.' [Citations.]" (*Suh, supra,* 181 Cal.App.4th at p. 1512.)  In any event, whatever the national trend might be, Kristi fails to demonstrate that any other jurisdiction would compel arbitration under the facts of this case, where the beneficiary has *not* either expressly or implicitly sought the benefits of a trust instrument containing the disputed arbitration provision.

## III.     DISPOSITION

The order denying Kristi's motion to compel arbitration is affirmed.  Kristi shall bear Pamela's costs on appeal.

14

_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.

15

Superior Court of Contra Costa County, No. MSP1200053, Joyce M. Cram, Judge.

Brillant Law Firm, David J. Brillant, Erica L. Shepard; Vaught & Boutris and Jon R. Vaught for Plaintiff and Respondent.

Bergquist, Wood, McIntosh & Seto and Steven N.H. Wood for Defendant and Appellant.