Filed 9/17/20  P. v. Ogbu CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>UCHECHUKWU OGBU<br><br>    Defendant and Appellant. | A157371<br><br>(Alameda County<br>Super. Ct. No. 17CR000038) |

Defendant Uchechukwu Ogbu was convicted of assault with a deadly weapon (knife) (Pen. Code[1] § 245, subd. (a)(1)) and was sentenced to a term of three years in state prison.  He seeks a new trial because the trial court (a) did not hold a section 1368 hearing to determine his competence to stand trial and (b) denied his request to present certain evidence in support of a claim of self-defense.  We affirm.

## Factual and Procedural Background

The assault charge arose from a stabbing in December 2016.  The prosecution's theory was that defendant stabbed an unarmed victim

---

[1] All further unspecified statutory references are to the Penal Code.

1

without provocation while defendant claimed the stabbing was in self-defense.  The jury trial took place in March 2019.

### A.    The People's Case

In December 2016, victim J.S.[2] worked as a protection specialist at a retail store in San Leandro, along with F.P. (asset protection specialist) and T.W. (loss prevention officer).  Store policy required personnel to at times "go off property to keep eye contact and then contact the police" concerning potential shoplifters.  The store authorized J.S. to conduct "receipt checks" (asking customer for purchase receipts) but he could not detain suspected shoplifters.  F.P. and T.W. were authorized to detain suspected shoplifters.

On the day in question, J.S., F.P., and T.W. were at work and in the store's security office.  J.S. was viewing a surveillance camera when he saw defendant pushing a shopping cart that contained a duffel bag and backpack; he watched as defendant left the store with the bag and backpack.  J.S. wanted to perform a receipt check on the duffel bag, which appeared to be "new" according to T.W.  J.S., F.P., and T.W. left the store so that J.S. could conduct a receipt check.

They reached defendant on the walkway at a local Bay Area Rapid Transit (BART) station, which was several hundred feet from the store.  J.S. approached defendant, while F.P. and T.W. maintained a slight distance.  J.S. identified himself as store security and asked if defendant could provide a receipt.  Defendant refused and responded, "I don't know who you are," with an "attitude" that was "defensive, yelling, [and] upset."  J.S. repeated that he worked for store security

---

[2]     Pursuant to the California Rules of Court, rule 8.90, governing "Privacy in Opinions," we refer to the victim and certain witnesses by their initials.

and exhibited a walkie-talkie with visible store insignia as proof of his identity. J.S., who was not armed, never raised his voice or threatened defendant.

When defendant reached into the duffel bag, J.S. turned to leave because he did not know what was in the bag and wanted to defuse the situation. Realizing that defendant's duffel bag was not new and therefore not store merchandise, both T.W. and F.P. also left. As all three store employees walked away, defendant followed them, saying " 'No, you're not going nowhere,' " but the men did not respond and continued to walk. Defendant spit at J.S.'s back, hitting him on his neck and possibly his head. J.S. turned around to find defendant "in front of [his] face;" according to T.W., at this point defendant was attempting to "grab" J.S. Defendant then threw his right arm around J.S. and stabbed him in the back with a knife held in his right fist. J.S. attempted to get away while defendant continued to stab him in the chest, face, hand, and back until J.S. fell to the ground. The physical confrontation lasted approximately five to ten seconds.

The three employees moved a safe distance away from defendant and subsequently received help from police and medical personnel. At the hospital, J.S. received stitches and staples to close several stab and laceration wounds, and he later had surgery that left a visible scar on his hand. The jury was shown photographs of J.S.'s injuries as they appeared three days after the stabbing.

BART Police Officer Casey Tyler and BART Police Sergeant Joseph Mateu arrived at the scene in response to a dispatch call. Officer Tyler spoke with defendant, who was cooperative, not visibly injured or scared, and spoke "as though he felt he was the victim."

3

Sergeant Mateu seized as evidence J.S.'s shirt that was soaked in blood and defendant's knife that appeared to have blood on its 3.5-inch blade.

BART Police Officer Christoper Plumley also came to the scene and interviewed defendant inside the police substation at the BART station. The interview was audio-recorded and portions were played for the jury. During his statement defendant was "calm and cordial" and he did not appear to have been "assaulted or shocked." Defendant said he had been attacked, but never said he was afraid of his attacker. Defendant said his cell phone contained "video evidence" of the encounter, but refused to allow the officer to view it. Plumley gave several reasons for not making further attempts to obtain the cell phone video, including his belief that defendant's infliction of multiple stab wounds would not have been a commensurate response even if J.S. had been the initial aggressor.

## B. Defense Case

Defendant testified as follows. He visited the store to obtain medication but did not buy anything. He left the store and walked to the BART station while listening to loud music through headphones. At the BART station, he had put his duffel bag and backpack on the ground when "two individuals come up to [him]," J.S. and another man who was neither F.P. nor T.W. Defendant could not hear what the men said because of his headphones, but assumed they wanted cigarettes and said he could not help them.

When J.S. kept speaking, defendant partially removed his headphones and heard J.S. repeatedly saying, " 'Give me back my stuff.' " J.S. was not dressed "professionally," never said his name or mentioned store security, and never used the word "receipt." Eventually J.S. "started to reveal an affiliation" with the store, but he could not provide any corroboration other than a "walkie-talkie" in his

4

pocket with no visible store insignia.  Because defendant did not know what J.S. was talking about, defendant assumed J.S. "and his friend" were "trying to rob" him.  So defendant used his right hand to "cleverly conceal[ ][a] knife" and used his other hand to take out a cell phone to record the encounter.

When J.S. and the other man "started power walking away," defendant followed to see if he could get a photo of them while he held the blade covered by a sweater in his right hand.  To get the men's attention, defendant loudly said, " 'You haven't shown me anything and you're not going anywhere,' " " 'I want more from you.  You need to tell me what this is about,' " and " 'Hey, hey, I'll go back with you.' "  Defendant did not call the men names, he was not rude, and he did not spit at J.S.  The men did not verbally respond, but at some point they turned around and came at defendant.  Defendant lost sight of the second man, but J.S. turned around and punched defendant in the head at which point defendant instinctively "tried to push [J.S.] away with his right hand," which held the blade.  J.S. again punched defendant in the head and grabbed his shirt, and defendant again responded by pushing J.S. away, this time in J.S.'s "lower backside."  Defendant felt threatened, shaky, and in fear of his life.

Defendant denied that J.S. held him in a bear hug or head lock, and insisted that there was "zero struggle" between them except for J.S.'s two punches and grabbing of defendant's shirt, and defendant's successful attempts to push J.S. away.  Defendant inflicted only two of the several stab "marks" on J.S., and did not know how the other "marks . . . were added to [J.S.'s] body."  Defendant asserted "there was no blood on [his] knife" when he gave it to the police.

Because defendant saw blood on J.S. and was worried about him, he called 911 with the cell phone that he used to record the encounter and with his other cell phone he called his mother. He cooperated with the police when they arrived.

## DISCUSSION

### I. Trial Court's Refusal to Hold a Section 1368 Hearing to Determine Defendant's Competence to Stand Trial

#### A. *Relevant Facts*

On the day the case was assigned to a trial department, defendant's retained counsel moved for a hearing to determine defendant's competence to stand trial as defendant's "behavior [was] pretty erratic" and "volatile." Specifically, that day outside the courthouse defendant had been yelling at him and defense counsel was not sure how defendant would act in the courtroom. The trial court explained that an attorney-client dispute was not evidence of incompetence, especially given the lack of "a manifestation on the part of [defendant] that he ha[d] some mental health problem such that it would be difficult for him to comprehend what's going on, to participate in his defense." The trial court noted it was not aware of anything indicating defendant was not competent to proceed to trial and denied the motion.

Defense counsel then informed the court that defendant had said many "strange things," including that defense counsel and a former judge assigned to the case were "working for" the store that had employed the victim and defense counsel was "[being] paid off" by other people to secure a conviction. Defendant acknowledged these statements and felt "volatile" because of the long delay in his case. The

6

trial court again stated it was denying the request for a section 1368 hearing because whether defendant trusted his counsel or the trial court was "a separate issue" from whether defendant was competent to stand trial.

### B.    Applicable Law

"[S]ection 1368, subdivision (a) provides, in relevant part, that '[i]f, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant,' the trial court must suspend proceedings to determine the defendant's competence.  [Citation.]  A defendant is incompetent to stand trial if the defendant lacks [either] 'sufficient present ability to consult with his [or her] lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him [or her].'  [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 201 (*Mickel*).)

"Because the decision whether to order a competency hearing 'is for the discretion of the trial judge,' we will not reverse it on appeal unless 'a doubt as to [mental incompetence] may be said to appear as a matter of law or where there is an abuse of discretion.'  [Citation.]" (*Mickel*, *supra*, 2 Cal.5th at p. 201.)  "On review, our inquiry is focused not on the subjective opinion of the trial judge, but rather on whether there was substantial evidence raising a reasonable doubt concerning the defendant's competence to stand trial. [Citation.] Evidence may be substantial even where it is contested or presented by the defense. [Citation.] A trial court reversibly errs if it fails to hold a competency hearing when one is required under the substantial evidence test. [Citation.]" (*Mickel*, *supra*, at p. 195.)

## C.    Analysis

"[U]nder the substantial evidence test . . . the focus of the competence inquiry is on a defendant's understanding of the criminal proceedings against him or her and the ability to consult with counsel or otherwise assist in his or her defense. [Citation.]"  (*Mickel, supra*, 2 Cal.5th at p. 202.)  Here, the trial court acted well within its discretion in finding that neither defendant's belief that there was a conspiracy to assure his conviction nor his disagreement with defense counsel necessarily suggested that defendant lacked the requisite ability to understanding the criminal proceeding against him or the ability to consult with his counsel or assist in his defense.  Contrary to defendant's contention, " '[m]ore is required to raise a doubt than mere bizarre actions or bizarre statements' " made by defendant, " 'or statements of defense counsel' " that defendant was unable, as opposed to unwilling, to assist counsel.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 431, quoting *People v. Laudermilk* (1967) 67 Cal.2d 272, 285; see *People v. Mai* (2013) 57 Cal.4th 986, 1033 [defense "[c]ounsel's assertion of a belief in a client's incompetence" does not constitute substantial evidence of incompetence]; *Mickel, supra*, at p. 202 ["[d]efendant's trial demeanor is relevant to, but not dispositive of, the question whether the trial court should have suspended proceedings under section 1368"].)

We also see no merit to defendant's argument that the trial court abused its discretion by failing to consider "other potential evidence" of his competence, i.e., by requesting to hear testimony of family members who might have provided evidence sufficient to raise a doubt regarding defendant's mental health.  Defendant cites no case law that requires

8

the court to sua sponte call family members or other witnesses before deciding whether it has a doubt as to defendant's competence to stand trial. (See *Mickel, supra*, 2 Cal.5th at p. 204 [letters from family and friends that, among other things, defendant had been assessed by psychiatrists, and he was " 'crazy' " or " 'very confused and disturbed,' " not substantial evidence of incompetence].)

Nor are we persuaded by defendant's reliance on the trial court's finding that defendant appeared to be suffering from an undiagnosed "personality disorder that gives rise to paranoia on his behalf," thereby reducing "his culpability for this crime" and that this constituted a mitigating factor for sentencing. (See Cal. Rules of Court, rule 4.423(b)(2) [circumstances in mitigation include that defendant is suffering from a mental condition that significantly reduces culpability for the crime]). While the trial court's comments "reflect generalized concerns that defendant suffered from . . . a [psychiatric disorder], . . . they do not show that defendant was, as result of a mental illness, unable to understand the nature and purpose of the criminal proceedings against him or" assist in his defense such that the court was required to declare a doubt about defendant's competence and order a section 1368 hearing. (*Mickel, supra*, 2 Cal.5th at p. 203; see *People v. Blair* (2005) 36 Cal.4th 686, 714 ["even a history of serious mental illness does not necessarily constitute substantial evidence of incompetence that would require a court to declare a doubt"].)

In sum, "[t]he evidence before the trial court . . . did not amount to substantial evidence requiring the court to suspend proceedings prior to entering judgment. Because of this, we cannot conclude the court abused its discretion by failing to declare a doubt as to

defendant's competence and order a [section 1368] hearing. We therefore reject defendant's claim." (*Mickel, supra*, 2 Cal.5th at p. 204.)

## II. Trial Court's Evidentiary Rulings

### A. Evidence of Defendant's Statements

During the pretrial conference, defense counsel moved to admit evidence of defendant's statements made when he called his mother on his cell phone after the stabbing; specifically that he told her he had been attacked and scared, and had to stand his ground. Counsel argued for the admission of these statements as spontaneous declarations and represented he could call defendant's mother as a witness. This request was tentatively denied without prejudice to renewal of the request during trial. The trial court was not aware of the admissibility of "a self-serving statement made by somebody after he's been accused of an assault," and did not believe a foundation could be laid for such evidence. Nonetheless, its denial was "without prejudice because we can have [an Evidence Code section] 402 hearing. [Defendant's mother] can testify outside of the presence of the jury, and if during her testimony she can satisfy the requirements of a spontaneous statement, then I would reconsider my ruling. . . ." The record does not indicate defense counsel ever renewed the request to admit defendant's statements as spontaneous declarations and defendant's mother was never called as a witness.

Defendant argues the trial court abused its discretion in denying his request to admit evidence of his statements as spontaneous declarations. "We reject the argument at the threshold for it was not preserved for appellate review. As a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not

10

renewed." (*People v. Mills* (2010) 48 Cal.4th 158, 170.) The record shows that while the trial court tentatively denied the request to admit evidence of defendant's statements, its comments were "not a definite ruling" against admission of the evidence; "the absence of an adverse ruling precludes any appellate challenge." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1179.)

Defendant complains that the trial court's comments at the time of its tentative denial seemed to provide little room for reconsideration, and therefore it would have been "futile," "redundant," or "pointless" for counsel to renew the request to admit evidence of defendant's statements as spontaneous declarations. We disagree. There is nothing in the record that demonstrates defense counsel was or would have been dissuaded from renewing the request to admit evidence of defendant's statements by calling defendant's mother as a witness. Rather, the record shows the trial court anticipated defense counsel would call defendant's mother as a witness at which time it would conduct an Evidence Code section 402 hearing and reconsider its ruling.

Defendant makes no argument that the trial court erred in refusing to admit the evidence without an Evidence Code section 402 hearing. And, indeed, any such argument could not be made because no objection was lodged to the trial court's decision to reconsider its ruling after such a hearing. Accordingly, we conclude defendant has forfeited his contention that the exclusion of his statements as spontaneous declarations was erroneous by his failure to renew his request to admit this evidence during the trial. (See *People v. Smith* (2003) 30 Cal.4th 581, 632 [because defendant failed to renew request

11

to admit certain evidence for specific reasons, he "may not now argue on that basis that its exclusion was error," citing Evid. Code § 354].) Moreover, we note that there does not appear to be any abuse of discretion in the trial court's decision. (See *People v. Williams* (1997) 16 Cal.4th 153, 197 ["a trial court's decision to admit or not admit evidence, whether made *in limine* or following a hearing pursuant to Evidence Code section 402, is reviewed only for abuse of discretion"]; see also *People v. Morris* (1991) 53 Cal.3d 152, 190 [a pretrial or in limine motion preserves an evidentiary issue only if, among other thing, "the motion is made at a time before or during the trial when the trial judge can determine the evidentiary question in its appropriate context"].)

We also reject defendant's assertion that we should consider the merits of his claim that his statements qualified as spontaneous declarations and exclusion of this evidence violated his constitutional Sixth and Fourteenth Amendment rights. "One function of an offer [of proof] at trial is to provide a reviewing court with the means of assessing prejudice from any error (citation), thus enabling a party challenging the judgment to meet its burden of affirmatively showing *reversible* error by an adequate record (citation). Nothing in this record properly shows, beyond surmise, what [defendant's mother] would have said" if called as a witness at trial. (*Gutierrez v. Cassiar Mining Corp.* (1998) 64 Cal.App.4th 148, 161-162; italics in original.) "It is well settled, of course, that a party challenging a judgment has the burden of showing reversible error by an adequate record. [Citations.] Because [defendant] has failed to provide such a record, we have no

occasion to consider further the merits of his" claim of error. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574-575.)

### B. Evidence of Victim's Violent Character

After defendant completed his testimony, defense counsel asked to call witnesses to testify to a June 1, 2017 shouting incident to show that J.S. was a "violent" person and to corroborate defendant's testimony that J.S. was the aggressor before being stabbed. Defense counsel stated J.S. "was really mad" immediately after testifying at the preliminary hearing; when he left the courtroom he started "screaming" at defendant and was "[l]oud, boisterous yelling, pushing forward." Defense counsel believed defendant's mother and the prosecutor would testify that defendant and defense counsel were talking privately in the hallway of the courthouse when J.S. approached and "was ready to start a fight with" defendant, but the prosecutor came forward and successfully stopped J.S. Defense counsel did not know if the incident had been reported to the Sheriff's Department and no statements had been taken from defendant's mother regarding the incident.

Without objection, the trial court framed the issue as whether defendant could call as witnesses his mother and the prosecutor to testify about the June 2017 shouting incident when no pretrial notice had been given, no report had been made, and no witness statements had been taken. So framed, the trial court denied the request under Evidence Code section 352 and explained that, regardless of the bare "minimal probative value" of the incident, the admission of the proffered evidence "would necessitate undue consumption of time or create substantial danger of undue prejudice or confusing the issues or mislead the jury."

13

The law governing the admission of evidence of a victim's subsequent acts of violence is well-established; such evidence "is admissible . . . to prove [the victim's] aggressive and violent character at the time of the earlier crime." (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 444 (*Shoemaker*).) While "this post crime character evidence is relevant and, like all relevant evidence, is admissible," it may be "properly excluded under Evidence Code section 352." (*Shoemaker*, *supra*, at p. 444.) "Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; italics in original.)

We find no abuse of discretion in the trial court's finding that evidence of the shouting incident was of limited probative value vis-a-vis the issues to be resolved by the jury concerning the December 2016 stabbing. Based on defense counsel's offer of proof, any evidentiary value as to J.S.'s propensity for violence was greatly diminished by the fact that it did not involve a physical altercation between J.S. and defendant. Instead, it appears to have been an isolated verbal encounter which would create undue prejudice in that the evidence would "merely make[ ] the victim of a crime look bad." (*People v. Kelly* (1992) 1 Cal.4th 495, 523.)

14

We also see no abuse of discretion in the finding that admission of the incident would unduly prolong the trial. In the absence of a written report or statements, the parties would be required to call witnesses to testify as to precisely what occurred. Defendant's assertion that the trial court could have limited him to calling one or two witnesses (defendant's mother and/or the prosecutor) does not account for the fact that the People would have been entitled to call rebuttal witnesses at a minimum including defendant, defense counsel, and J.S.

Moreover, the jury would have had to first determine what actually occurred on that occasion, and would then have to consider its impact (if any) on their consideration of defendant's claim that during the December 2016 stabbing incident J.S. was the initial aggressor. Thus, the jury could have been misled or confused as the more time spent on the shouting incident, the greater the risk that the jury would lose sight that the victim's purported conduct on that occasion was not directly at issue in the assault case. (*People v. Snow* (2003) 30 Cal.4th 43, 90 (*Snow*).)

We therefore conclude the trial court did not abuse its discretion in refusing to admit evidence of the June 2017 incident under Evidence Code section 352. (*Snow, supra,* 30 Cal.4th at p. 90.) We also conclude, despite defendant's argument to the contrary, that this evidence was not "of such probative strength that its exclusion violated his constitutional right to present a defense." (*Ibid.*) The "marginal probative value of this evidence does not take it outside" the usual rule that "[a]pplication of the ordinary rules of evidence, such as Evidence

Code section 352, generally does not deprive the defendant of the opportunity to present a defense." (*Ibid.*)

## DISPOSITION

The judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Siggins, P.J.


_____
Fujisaki, J.

*People v. Ogbu/A157371*

17